THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v THOMAS JOHNSON, Appellant.

First Department, April 13, 1982

**APPEARANCES OF COUNSEL**

*Charles L. Weintraub* for appellant.

*Curtis Hall* of counsel (*Mark Dwyer* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

**OPINION OF THE COURT**

ASCH, J.

Defendant was found guilty of criminal possession of a controlled substance in the second degree. Prior to trial, he had moved to suppress physical evidence that had been seized, as well as statements he had made at the time of his arrest. After hearing on February 24 and 25, 1981, Justice CLIFFORD A. SCOTT denied both motions.

Defendant claims that the police impermissibly searched the room where he was taken into custody, and that the fruits of that search should have been suppressed. Defen-

dant also claims that the statements he made there were the product of an illegal custodial interrogation.

In view of what actually transpired on September 30, 1980, the suppression rulings of the court below were justified. Police Officers Pritchard and Gorman received a radio call of a "man with a gun". Upon arrival at a brownstone converted into a rooming house, they were met by one Calvin Ford, the superintendent of the building. Ford told the officers a man had just tried to shoot him, had "struck him on the head with a 'black automatic pistol' ", had entered an apartment at the end of the hallway and was in there "now". Ford warned the officers to "be careful" because "he has a gun".

After a certain amount of knocking and kicking upon the door by the police, defendant opened it. The officers saw defendant standing near the door at the foot of a double bed in a "very small" room, about 10 feet long and 12 feet wide. Officer Pritchard entered the room, told defendant he was under arrest and frisked him. When the frisk failed to uncover a weapon, Pritchard asked the defendant whether the shoulder bag on the bed was his. The bag was about one and a half to two feet away from where defendant was standing. Defendant said the shoulder bag was his and Pritchard dumped the contents on the bed. There was no gun in the bag but there was a glassine envelope containing white powder later shown to be heroin, with strips of blue tape on the envelope. Also in the bag were a set of keys (one of which opened the door to this room), three or four credit cards, and a checkbook, all of which bore defendant's name.

Defendant was not handcuffed at the point of time when Officer Pritchard emptied the shoulder bag onto the bed and examined its contents. Officer Pritchard noticed stacks of glassine envelopes on a shelf above the sink. There were five stacks each containing ten glassine envelopes bound together by a rubberband. Each glassine envelope, later found to contain heroin, was marked with blue strips of tape.

On the bed was a "blue grinder", a device commonly used to refine narcotics. Officer Gorman lifted the mattress and found a large sum of money between the mattress and the

box spring. When asked if the money was his, the defendant first said it was his and then said it was not. As they were leaving, Officer Pritchard asked defendant if the money under the mattress was his and defendant replied that it was not. Another officer, Clancy, found an automatic pistol in the backyard of the building.

The evidence at trial clearly established that defendant knowingly possessed over two ounces of heroin, and was therefore guilty of criminal possession of a controlled substance in the second degree. This evidence was similar to that brought out at the suppression hearing.

The police officers were justified in seizing the heroin found in defendant's shoulder bag and the money found under the mattress. An arresting officer may conduct a warrantless "search of the arrestee's person and the area 'within his immediate control' — construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence" (*Chimel v California,* 395 US 752, 763). "[T]he search incident to arrest * * * is grounded in protecting the safety of the arresting officer by permitting him to search for and seize weapons when there is reason to fear for his safety and in preventing the person arrested from destroying evidence of criminal involvement by permitting the arresting officer to search for and seize such evidence." (*People v Belton,* 55 NY2d 49, 52-53.)

Both the shoulder bag and the mattress were within two feet of defendant, clearly within his reach. Defendant contends, and Justice SCOTT, in his findings of fact upon the motion to suppress (reproduced in full in the dissent), supports the claim that the defendant was handcuffed, then frisked and the room searched. However, the record shows that the defendant was *not* handcuffed at the time of the search of the immediate area. Police Officer Pritchard indicated a few times that defendant was handcuffed at the time of the search but, it is clear from a reading of the record, that the police officer was confused in his answer on cross-examination concerning this issue. Otherwise, the record is replete with unambiguous statements by Pritchard that the defendant was *not* handcuffed at the time of the search. In addition, and most telling, upon his argument at the close of testimony at the suppression

hearing, defense counsel conceded "[t]he fact is that at that point [i.e., when the search occurred] he wasn't handcuffed, because the officer chose not to handcuff him".

Even assuming defendant *had* been handcuffed, the search would still have been proper given defendant's close proximity to the shoulder bag and mattress (see *United States v Mason,* 523 F2d 1122, 1126). The suppression court certainly attached no significance to whether defendant was handcuffed at the time the evidence was discovered. We should not ignore the highly dangerous and volatile situation with which the police, in this case, were confronted, making it impossible for us to know with certainty exactly what happened or the precise sequence of events which took place.

With respect to the seizure of the 50 glassine envelopes, the "plain view" doctrine is clearly applicable. Upon rightfully entering defendant's room, arresting defendant and searching his handbag, Pritchard could not avoid seeing what was in plain view. The evidence was not concealed and the police officers were entitled therefore to legally seize it. (See *Coolidge v New Hampshire,* 403 US 443, 464-473.)

Defendant, while in custody and before having been advised of his *Miranda* rights, made three statements which he now argues should be suppressed: one statement concerned his presence in the room; another his ownership of the shoulder bag; and a third, his ownership of the money found under the mattress.

After the police officers entered the premises, Officer Pritchard asked defendant "What are you doing here?" Defendant responded that he "stopped in the room to make a phone call". This question "was designed to clarify the nature of the situation confronted, rather than to coerce a statement" and was therefore permissible. (*People v Huffman,* 41 NY2d 29, 34.)

When the police officers entered the room and placed defendant against the wall, they were looking for the gun which they reasonably believed he possessed. While looking for the gun, Officer Pritchard saw defendant's shoulder bag on the bed, immediately grabbed it and asked whether

it belonged to defendant. This question was not for the purpose of eliciting an incriminating response from the defendant. It was asked obviously out of Pritchard's concern for his safety in finding and securing the gun and was also permissible. "The fact that there may have been police questioning is not controlling." Rather, "[c]ustodial admissions are not suppressible unless produced by a process of interrogation designed to elicit statements from the defendant." (*People v Huffman, supra,* p 33.)

The statements made by defendant admitting and denying ownership of the money found under the mattress in response to Officer Gorman's question whether it belonged to defendant, do not constitute an impermissible interrogation. Officer Gorman was attempting to determine who owned valuable property not plainly contraband, and which had to be inventoried, discovered in the course of the search. Significantly, the defendant was not questioned with regard to the contraband, which would have been the more relevant inquiry if the police were seeking to elicit incriminating statements. The questioning here was analogous to questioning designed to elicit pedigree information; both serve "housekeeping" purposes and need not be preceded by *Miranda* warnings (see, e.g., *People v Rodriquez,* 39 NY2d 976, 978; *People v Rivera,* 26 NY2d 304, 309). The fact that the question was asked more than once does not transform otherwise proper questioning into custodial "interrogation". (See *People v Greer,* 42 NY2d 170, 178.)

As noted, the statements were not the product of impermissible interrogation, but, in any event, these statements were far from critical to the People's case. At the same time, they did not weaken the appellant's position. If the questions of Officer Gorman concerning the ownership of the money were improper, the error was harmless since defendant's statements were inconclusive.

Defendant's ownership of the shoulder bag was established by the checkbook and credit cards in his name and the key ring found in the bag. The key ring contained a key to defendant's Mercedes automobile parked outside the building. Defendant's statement that he entered the room

to make a telephone call was essentially meaningless, certainly not incriminating.

Defendant's guilt of the crime of having knowingly possessed heroin was established by the fact the 50 glassine envelopes in open view matched in make up and appearance an envelope in a shoulder bag containing his property. They were found in a room to which defendant possessed a key and in which defendant was alone. Presented with this evidence, it is not conceivable that the defendant's statements affected the jury's verdict.

With respect to the remaining grounds raised by the defendant upon this appeal, we find that they have either been waived below or otherwise lack merit.

Accordingly, the judgment of the Supreme Court, New York County (NECO, J., at trial and sentence; SCOTT, J., on motion to suppress), rendered June 12, 1981, convicting defendant, after a jury trial, of criminal possession of a controlled substance in the second degree (Penal Law, § 220.18) and sentencing him to an indeterminate prison term of from five years to life, should be affirmed.

CARRO, J. (dissenting). I quote the findings of fact made by the hearing court, for all of which there is substantial support in the record:

On September 30, 1980 at approximately 6:00 A.M. Police Officer James Pritchard and his partner who were on uniform patrol duty received a radio run of "a man with a gun" at 232 West 112th Street in Manhattan. The officers went to the given location which was a rooming house. Upon the officer's arrival the entrance door to the building was locked. Behind the door Pritchard heard the sound of voices and particularly the voice of a man who was heard saying, "The police are here. What are you going to do now? They have bigger guns than you."

After a brief wait a man identified as Calvin Ford opened the entrance door and admitted the police officers into the building. There was a lump on Ford's forehead and he stated that a man tried to kill him and struck him with a pistol. Ford directed the officers to a room at the rear of the first floor where he stated that the man had gone. He warned the officers that the man had a gun. The door to the

room was locked and Officer Pritchard knocked and announced his presence. After a pause the defendant opened the door and he was identified by Ford as the assailant. Upon entering the room Officer Pritchard directed the defendant to face a wall, handcuffed and frisked him.

"The room was approximately 10 feet by 12 feet in dimension and contained a bed, a dresser and other furniture. Officer Pritchard looked through the room for the gun which was used in the alleged assault upon Ford. He noticed a shoulder bag on the bed and asked the defendant if it was his. The defendant acknowledged that it was. The officer emptied the contents of the bag on the bed and found among the contents items of identification, a key to the room and a glassine envelope containing heroin.

"Richard Gorman, another police officer who was present, looked under the bed's mattress and found approximately $(6)4,000 in currency. Gorman asked the defendant if the money belonged to him. The defendant initially said it was his but later denied ownership of the money when the question was repeated.

"On an open shelf above a sink Officer Pritchard saw and recovered additional glassine envelopes of heroin packed in five separate bundles. During the same sequence of events another police officer who was present in the room searched the backyard of the premises and recovered a handgun. The defendant was taken to the local precinct for processing of his arrest. At the precinct the defendant was given Miranda warnings which were read to him and he indicated that he did not wish to make any statement".*

The motion to suppress the physical items seized and the admissions made by defendant was denied in its entirety. Defendant was convicted after jury trial of criminal possession of a controlled substance in the second degree and was sentenced to an indeterminate term of five years to life. The majority affirms. However, I respectfully dissent. The motion should have been granted to the extent of suppressing the contents of the shoulder bag, the money found

---

\* The testimony further indicates that the defendant was handcuffed behind his back and placed against the wall, the officers had their weapons drawn upon entering the room, and there were at least four and probably as many as six or seven officers in the room at the time of the search.

under the mattress, and the admissions as to each of those. Accordingly, the conviction should be reversed and the matter remanded for new trial.

Every unreasonable search and seizure is proscribed by the Fourth Amendment to the Federal Constitution and by section 12 of article I of the State Constitution. A search conducted without a warrant is per se unreasonable, subject only to a very few narrow and specific exceptions. (*Katz v United States,* 389 US 347, 357; *Coolidge v New Hampshire,* 403 US 443, 481; *Terry v Ohio,* 392 US 1, 20; *Mincey v Arizona,* 437 US 385, 390; *People v Hodge,* 44 NY2d 553, 557; *People v Belton,* 55 NY2d 49, 52.) "One such exception is the search incident to arrest, the classic statement of which is in *Chimel v California* (395 US 752, *supra*)". (*People v Belton, supra,* p 52.)

The language in *Chimel* just recently referred to by the Court of Appeals with such approbation is as follows (at pp 762-763):

"When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control' — construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

"There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs — or, for that matter, for searching through all the desk drawers or other closed or concealed areas in

that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant."

The *Chimel* court went on to state (p 766) "[n]o consideration relevant to the Fourth Amendment suggests any point of rational limitation, once the search is allowed to go beyond the area from which the person arrested might obtain weapons or evidentiary items. The only reasoned distinction is one between a search of the person arrested and the area within his reach on the one hand, and more extensive searches on the other".

As our Court of Appeals has just made clear, the rationale and language of *Chimel,* as applied to our own Constitution, is still the law of the State of New York.

What of the application of the language and rationale to the facts of this case? Clearly, under the exigencies present, there was probable cause to enter and to arrest, as was done. The defendant was immediately secured and placed under the total control of the police. His hands were cuffed behind his back; he was placed against a wall in close proximity to several armed officers. At that point he was in custody and was effectively immobilized. He was not, however, "warned" of his Fifth and Sixth Amendment rights. He had been placed approximately two feet from the bed. On that bed was a shoulder bag. The police had entered the room upon Ford's complaint that defendant had just attacked and struck him about the head with a gun. It was therefore logical to expect that the weapon might be within the bag in plain sight on the bed. And had the defendant not just been immobilized, it would have been reasonable and prudent for the officer to immediately reduce that bag to possession, to "grab" it, and even to ask, "Is this yours?" But such was not the case; the defendant was in fact secured. He was in no way capable of "grabbing" the bag on the bed, not to mention the hidden and less "reachable" money under the mattress. To suggest that these items were in an area "within his immediate control", is to engage in a fiction. If our superior courts wish to define a greater or more specific area to be subject to a search incident to a valid arrest, let them only say so — whether that area be measured by feet and inches or any

other clearly ascertainable method. Until then we should be bound by the plain meaning of the language they have thus far retained.

The police could have, with no danger of loss of evidence, secured the room and the shoulder bag and obtained a search warrant. That would have been inconvenient. The evidence "lay at their feet", waiting only to be picked. To interpose a magistrate between the police and the search at that point would have seemed unduly burdensome to the police. And there is no question but that it would have been burdensome.

"One must be careful to distinguish between constraints on police conduct which limit effective police enforcement and those constraints which merely make effective police enforcement more burdensome. In the case at bar there was absolutely no justification - either relating to exigent circumstances or the nature of the search or seizure effected - for not obtaining a search warrant. The mere fact that it would be burdensome to obtain a warrant, standing alone, is never justification for not obtaining a search warrant (*McDonald* v. *United States,* 335 U.S. 451, 455; *Coolidge, supra,* pp 479, 481).

"We do a great disservice to the highly professional and efficient law enforcement officials of this State to determine that they cannot perform their job effectively without impinging upon a very important constitutional right. Duties of law enforcement officials are extremely demanding in a free society. But that is as it should be. A policeman's job is easy only in a police state." (*People v Spinelli,* 35 NY2d 77, 81-82.)

Upon the officers' entry into the room, the defendant was immediately placed in custody, as previously described. Any questioning which followed was, by definition, custodial. The *Miranda* warnings should have been given (*Miranda v Arizona,* 384 US 436). The questions propounded were not, as urged by the People, "housekeeping" inquiries similar to those designed to elicit pedigree information and "following good police practice by seeking an explanation of the situation." They were questions the answers to which could apparently lead to damaging admissions

against defendant and were not at all analogous to the question propounded in *People v Huffman* (41 NY2d 29).

The motion to suppress should have been granted in part, as indicated, and the conviction should be reversed and the matter remanded for new trial.

KUPFERMAN, J. P., SANDLER and SILVERMAN, JJ., concur with ASCH, J.; CARRO, J., dissents in an opinion.

Judgment, Supreme Court, New York County, rendered on June 12, 1981, affirmed.