OPINION OF THE COURT
Michael R. Juviler, J.

The Issue

This is an expanded version of an oral decision denying, after a hearing, a motion to suppress a statement to a police officer. The defendant had made the statement while he was *672 locked in a crack spot to sell drugs and the officer was standing outside. The defendant moved to suppress the statement on the ground that it was the product of “custodial interrogation” without Miranda warnings.
The method of operation in which drug dealers imprison the seller has been addressed with growing frequency in the Brooklyn criminal courts; this device protects the stash and drug money from robbers and insures that the seller will not run off with the drugs or the proceeds.* This appears to be a case of first impression on whether Miranda applies in that setting.

The Facts

I accept as honest, accurate, and reliable the testimony of the sole witness at the hearing, Officer John Muzek.
On the afternoon of October 10, 1990, Officer Muzek, in uniform, was on narcotics street enforcement patrol in a precinct in Brooklyn. He went to the entrance of a three-story brownstone building, 321 Quincy Street, a suspected crack spot.
Officer Muzek stood so that no one inside could see him and knocked on the door of the first floor.
“What do you want?” said someone inside, the defendant. The door had an opening or was ajar a crack so that the customer and the defendant could hear but not see each other.
Officer Muzek asked, “Selling?” Posing as a buyer, he wanted to know whether the suspected crack spot was then active.
The defendant answered, "Yes.”
"Police officer. Come Out.”
"I can’t get out. I’m locked in from outside. Can you get me out and lock me up for trespass?” The door to the premises was padlocked from the outside.
At the hearing, the officer did not remember whether he had responded to the defendant’s request with a question. I *673 find that under the circumstances it would have been natural to ask the defendant a question to help the officer gain his release, and that is what happened; he asked the defendant how he had got in there.
The defendant replied that he had been picked up at a men’s shelter, had been put inside to work, and just wanted to get out.
The officer and his partner got clippers, cut the locks, and freed the defendant. The police officers found that he had been confined in a three-foot-square space. Also inside were 40 vials of crack. Officer Muzek arrested the defendant for criminal possession of a controlled substance.
The Law of "Custodial Interrogation”
The question here, raised under Miranda v Arizona (384 US 436), and its interpreting cases, is whether the defendant’s statements from inside the crack spot were the product of "custodial interrogation”. If so, the Miranda warnings were required. Because they were not given, the defendant’s statements would have to be suppressed.
There is no serious issue regarding the officer’s first question, "Selling?” At that point he was pretending to be a civilian drug buyer, and there is no arguable claim of police custody or police interrogation then. The real issue is the officer’s next question, to the effect, "How did you get in there?” By then he had identified himself as "Police” and had ordered the defendant to "Come out”.

1. "Custody”

Miranda held that "custody” occurs when the defendant "is taken into custody or otherwise deprived of his freedom by the authorities in any significant way” (supra, at 478). If the suspect is then "subjected to questioning”, the warnings of his rights are required to counteract the inherently coercive effect of the police-dominated atmosphere.
Applying this reasoning, the court held in Mathis v United States (391 US 1) that a prisoner serving a sentence in a State jail was in "custody” when he was questioned there by Federal Internal Revenue agents who were investigating a matter unrelated to the reason for his imprisonment. The court rejected the Government’s argument that no Miranda warnings were required because the prisoner had not been placed *674 in custody by the Federal Government, which was conducting the investigation.
The court’s reasons for rejecting that position support the admissibility of the defendant’s statement in the present case.
The court took note of the language in Miranda (supra, at 478), quoted here, specifying that the deprivation of freedom must be created "by the authorities”, and noted that "the authorities” collectively had placed Mathis in custody; therefore, Miranda warnings were required before he could lawfully be interrogated in an official investigation.
In the present case, it was not the authorities who had placed the defendant in custody and imprisoned him in the crack spot, but criminals higher up in the drug operation. Although the defendant was not free to leave, his confinement was not the type "associated with a formal arrest” so as to require Miranda warnings. (Cf., People v Bennett, 70 NY2d 891, 894.)
The test of custody used in New York for the requirements of Miranda warnings is the objective standard in People v Yukl (25 NY2d 585, 589, cert denied 400 US 851): what a reasonable person, innocent of any crime, would have thought in the defendant’s position. This test is not strictly adaptable to the present case; by the time the officer had asked the question at issue, the defendant already had offered to sell him drugs. But if one can assume that a reasonable, innocent person had been abducted by drug dealers and locked up behind the door, such a person would have understood that he had not been taken into custody "by the authorities”, that the officer was not trying to get an incriminating statement or pressuring him to give one, and that in that sense the atmosphere was not police-dominated.
The courts have specified six factors to be considered in applying the objective standard of Yukl (supra). They all indicate that Miranda warnings were not required here. As set forth in People v Arcese (148 AD2d 460), and People v Bailey (140 AD2d 356), they are:
(1) The amount of time the defendant spent with the police. Strictly speaking, the defendant was alone, and he spent no time "with” Police Officer Muzek. They could not see each other, and they were separated by a locked door. In a broader sense, he was "with” Officer Muzek, but only for the few seconds it took for Muzek to announce, "Police, open up”, and ask the one question, "How did you get in there?”
*675 (2) Whether his freedom of action was restricted in any significant manner. The defendant’s freedom of action was completely restricted, but not by the police, and he had turned to the police as a means to his release from the lockup, not as a source of continued restraint.
(3) The location of and the atmosphere under which the defendant was questioned. The defendant was on private property, not in the police precinct, and the officer had no access to him.
(4) The degree of cooperation exhibited by the defendant. The defendant was fully cooperative, and even asked the officer to arrest him.
(5) Whether he was apprised of his constitutional rights. The defendant was not so advised. After the hapless defendant had asked to be let out, if the officer had responded to his plea not by asking how he had got in, but by saying, "You have the right to remain silent * * * Anything you say can be used against you in a court of law * * * You have the right to consult an attorney before speaking * * * If you cannot afford an attorney, one will be appointed without cost to you”, that would have been absurd, if not cruel.
(6) Whether the questioning was investigatory or accusatory in nature. Officer Muzek’s question about how the defendant had got in the padlocked premises was investigatory, not accusatory. Clearly, not all police questioning of a person who is privately confined is "custodial interrogation”. (See, People v Phinney, 22 NY2d 288, 291 [injured suspect in hospital emergency room]; People v Harris, 142 AD2d 596 [burglar restrained by complainants in their house]; People v Green, 161 AD2d 359, lv denied 76 NY2d 857 [wounded robbery suspect in hospital]; People v Schreiner, 159 AD2d 737, lv granted 76 NY2d 847 [committed mental patient]; compare, People v Turkenich, 137 AD2d 363 [20-minute interrogation of mental patient involuntarily committed to a psychiatric hospital after arrest for disorderly conduct required Miranda warnings].) As the Appellate Division, First Department, said in a classic early discussion of Miranda, "We do not take it to be the law that, in every instance where freedom of action is restricted by causes other than restraint enforced by authority, interrogation is interdicted. Where, as here, the defendant was immobilized by factors entirely independent of any police activity, it might very well be that questioning would be proper if otherwise allowable.” (See, People v Tanner, 31 AD2d *676 148, 149-150 [but aggressive, prolonged relay questioning of wounded robbery suspect in hospital required Miranda warnings].)

2. "Interrogation”

The second half of "custodial interrogation” is "interrogation”. "Interrogation”, like "custody”, is a term of art. Not every question is "interrogation”. When, as in this case, an officer is seeking to clear up an odd situation, not to obtain an incriminating statement, Miranda warnings are not required.
The officer’s question, "How did you get in there?” or words to that effect, was a reasonable response to the defendant’s plea to the officer to free him from the lockup and arrest him for a minor offense. By then, Officer Muzek had realized that the defendant had been locked in from the outside, and it was appropriate to ask how he had got in, to facilitate his release. Muzek did not have to go through a Miranda litany before asking for that on-the-scene clarification of the situation. (See, People v Huffman, 41 NY2d 29, 34 [" 'What are you doing back here?’ ”]; People v Johnson, 86 AD2d 165, 168, affd 59 NY2d 1014 [" 'What are you doing here?’ ”]; People v Luna, 164 AD2d 870, lv denied 76 NY2d 941 [police officer subduing burglary suspect asked what a bulge in his pocket was]; People v Deresky, 134 AD2d 512 [officer’s question to murder suspect, who had just been arrested upon getting off an airplane, whether he had any luggage, "was not intended or designed to elicit an incriminating response”, so it "did not constitute custodial interrogation”].)
In People v Schipski (130 AD2d 781), a case very similar to this one, a police officer, responding to a radio call of a burglary in progress in a delicatessen, discovered the defendant inside the store loading cigarette boxes into a bag. When the officer and his partner could not gain entrance, the officer, his gun drawn, asked the defendant through the window how he had got into the store. The defendant answered through " 'the basement’ ” (supra, at 781). The officer’s question, said the court, "was clearly designed to enable the officers to gain entrance into the store and not to coerce a statement” (supra, at 782). Hence, Miranda warnings were not needed.
In People v Harris (142 AD2d 596, supra) the complainants found the defendant, a stranger, inside their house at 3:30 in the morning. The window was open and the television set had been removed. The defendant tried to run, but the complain *677 ant subdued him after a struggle and held him until the police arrived. The first officer who responded to the 911 call asked the defendant what he was doing in the house, and the defendant answered that he knew " 'these people’ ” and that they had let him in. When one of the complainants contradicted him, the defendant admitted that he was there to take the television set. Because "the officer’s single question as to the reason for his presence in the house had an investigatory purpose”, Miranda warnings were not required (supra, at 597).
If Miranda warnings were required in this case, they might also be required when the police negotiate with a kidnapper who is holding hostages in a house that is surrounded by the police. The court held in People v Gantz (104 AD2d 692, 693), that Miranda did not apply in that situation, for "Even assuming that defendant was in custody during the hostage negotiations a review of a transcript of the taped telephone conversations indicates the negotiations were directed toward providing defendant with medication and maintaining the hostages’ safety, not to elicit inculpatory statements”.

Conclusion

Because the defendant’s imprisonment in a crack spot was not brought about by the authorities or exploited by them to obtain an incriminating statement, and because there was no interrogation designed to obtain an inculpatory statement, but merely a question to clarify the defendant’s predicament, the Miranda warnings were not required.

 For example, in People v Boston (indictment No. 279/89, Sup Ct, Kings County), the defendant had been locked in a windowless room for five days. To gain entry, the police had to break through a wall. They found the defendant in the midst of feces, garbage, rats, and water bugs, the room lighted only by a candle. Also present were large amounts of heroin and cocaine packaged for retail sale, and $770 in cash. The drugs would be sold through a small hole in the front wall.