THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ALEX LEVAN, Appellant.

First Department, February 10, 1983

**APPEARANCES OF COUNSEL**

*Gary E. Divis* of counsel (*William E. Hellerstein,* attorney), for appellant.

*Marlene Nadel* of counsel (*Emily Berger* and *Amyjane Rettew* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

**OPINION OF THE COURT**

SILVERMAN, J.

The judgment of conviction should be affirmed.

The underlying facts are sufficiently stated in Justice CARRO's opinion. We differ as to the conclusion to be drawn from those facts — whether on the facts of this case the police acted reasonably and in accordance with the Fourth Amendment, particularly in the light of *United States v Santana* (427 US 38) on the one hand and *Payton v New York* (445 US 573) on the other.

Clearly the police had probable cause to believe that defendant had committed murder with a gun.

The arrest took place a week after the killing. No doubt the police could have obtained a warrant in the interim. But, at least in a great city in which many, many crimes

are committed every day, it overlooks practicalities of police administration to expect the police immediately to obtain anticipatory warrants in every case in which probable cause exists but the police do not know where a prospective defendant is or whether they ever will be able to locate or apprehend him. Here a week elapsed between the time that defendant was named as the perpetrator and the arrest.

When the police were informed that defendant was now at his apartment, they had to leave at once to apprehend him. Any delay would risk his becoming unavailable. Thus some exigency existed.

When the police arrived at the apartment, they did not break in. A woman — not by prearrangement with the police — knocked at the door. Defendant opened the door. He stood just inside the threshold, clearly visible to the police and to anyone else who might be in the public hallway. Thus "[he] was not in an area where [he] had any expectation of privacy. 'What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection.' * * * [He] was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if [he] had been standing completely outside [his] house." (*United States v Santana,* 427 US, at p 42.)

I do not think the holdings in *Payton v New York* and *Riddick v New York* (445 US 573) are applicable to this arrest. In those cases the United States Supreme Court expressly did not pass on whether there was any exigency justifying the warrantless arrest. In neither case had defendant come to and opened and stood at the open door of his home when arrested.

The police, with guns drawn, seized the defendant. They had a right to have their guns drawn — they were arresting a man whom they believed to have recently killed another with a gun. They of course had a right to frisk defendant, for their own protection and to ensure the integrity of their arrest.

Defendant was not wearing shoes. He was obviously going to have to put on shoes. It was reasonable to take him

into the apartment where his shoes were (*People v De Santis,* 46 NY2d 82, 88; *Washington v Chrisman,* 455 US 1, 7).

In *Washington v Chrisman (supra)* the arrest was made outside the dormitory where the arrestee lived, but the police were held to be authorized to accompany the arrestee to his room while he went to get his identification papers. How much more so were they justified in the present case in going into the apartment with defendant who in any event had to go there to get his shoes.

We do not have here merely a "stop and frisk" based on no more than reasonable suspicion, and justifying only such steps as are necessary to secure the officers' safety. Rather we have here an *arrest,* based on probable cause. A search incident to an arrest, unlike a mere stop and frisk, justifies a more extensive search, including a search of the area within the arrestee's control — the "grabbable" area — for weapons, fruits or instrumentalities of the crime, or "mere" evidence. (See *Terry v Ohio,* 392 US 1, 25; *People v Belton,* 55 NY2d 49, 52-53; *People v De Santis,* 46 NY2d, at p 88.)

In the room in which the officers frisked defendant, defendant was looking in the direction of a closet four to six feet from him — "to his left and down". The police saw some shoes there. Defendant would presumably have to put on a pair of those shoes. The police were looking for a gun, not for some other contraband. One of the officers went to the shoes and shook them, and discovered a gun. Defendant was two feet away when the gun was discovered. It was thus clearly within the grabbable area. We quite agree with Justice CARRO that reasonableness is not to be measured by precise feet and inches. But we draw from this the opposite conclusion — that the reasonableness of the action of police officers in prudently discharging their dangerous duty, with due regard to ensuring their own safety and the integrity of the arrest, and the proper search for weapons and evidence in the grabbable area is not to be defeated because the discovery of the weapon takes place a little closer or a little further from the defendant, or because a less prudent officer might have felt no need to take these precautions with respect to a man

who perhaps no longer posed a threat to them, or because these routine precautions might not only ensure the officers' safety but perhaps also discover instrumentalities or evidence of crime. "We are not to strain an immunity to the point at which human nature rebels against honoring it in conduct" (CARDOZO, J., in *People v Chiagles,* 237 NY 193, 197).

Considering the factors of reasonableness, exigency, the "close nexus to the time and place of the arrest" (*People v De Santis,* 46 NY2d, at p 89), and the "practicalities of police investigation" (cf. *People v Orlando,* 56 NY2d 441, 446), we think the hearing court properly declined to suppress the gun.

Accordingly, the judgment of the Supreme Court, New York County (KLEIMAN, J.), rendered on April 23, 1980 convicting defendant, after a jury trial, of criminal possession of a weapon in the third degree should be affirmed.

CARRO, J. (dissenting). Defendant-appellant Levan was indicted for murder in the second degree, manslaughter in the first degree and criminal possession of a weapon in the second and third degrees. His motion to suppress the weapon used in the homicide was denied. He was convicted after jury trial of criminal possession of a weapon in the third degree and sentenced to an indeterminate term of from one to three years.

On May 2, 1979, an eyewitness identified Levan as the perpetrator of a homicide which had occurred on April 28, 1979. Detectives went to defendant's apartment on several occasions during the following week in an attempt to apprehend him and left instructions at the building to call when he appeared. At no time during this period did the officers attempt to obtain either an arrest warrant or a search warrant, although it is not contested that they had probable cause to do so. On May 9, one week after the defendant had been identified, the Sixth Homicide Zone Office received a telephone call that the defendant was at home. Two cars containing six or seven detectives proceeded to the defendant's address. No warrant had been obtained.

Detective Grant was the principal People's witness on the hearing of the motion to suppress evidence. He testified as follows:

"Q Now, what happened when you arrived at the defendant's building * * *

"A I went to the second floor apartment and stationed myself outside in the proximity of the defendant's apartment in the building * * *

"A I was there for a couple of moments and a female came up the stairs and she had a pot containing food I believe. And she went to the defendant's apartment door and rang the door bell. The door bell opened — the door opened. Then I looked in the apartment and observed the defendant * * *

"The Court: * * * I am sorry, you said looked into the apartment. who looked into the apartment?

"The Witness: I looked into the apartment.

"The Court: When the door was opened?

"The Witness: In response to this female ringing the doorbell and knocking at the door.

"The Court: Then you looked into the apartment?

"The Witness: I looked past her and observed the defendant.

"Q What happened when you observed the defendant inside his apartment? What did you do next?

"A At that point I identified myself as a police officer and with my gun drawn I went past the female and took the defendant down the hallway into the living room * * *

"A I then took him as I stayed (sic) into the living room. I placed him up against the wall. At that point I then patted him down for weapons * * *

"The Court: Did your patting produce anything?

"The Witness: No, it did not."

When the defendant answered the door, he was wearing socks, trousers and a shirt, but no shoes. Detective Grant placed him, facing the wall, about four to six feet from the open door of a closet. After he patted Levan down and found no weapons or other contraband, he handcuffed him

and replaced the gun in its holster. Grant was admittedly looking for the weapon which had been used in the homicide. He saw defendant glance down into the open closet; there were clothes hanging and several pairs of shoes lined up on the floor. He stepped to the closet, picked up a pair of shoes and a pair of boots and shook them.* He felt something in the boot, turned it over, and a gun fell out. He yelled to the other officers that he had found a gun, put it in his pocket and patted down the clothes hanging in the closet, where he found nothing. Then, within a minute or two of finding the gun, he turned and handed it to Detective Campbell. In the meantime, the other officers were conducting a general search of the apartment and found ammunition in the kitchen drawers, which was not offered in evidence and is not in issue on this appeal.

*Payton v New York* (445 US 573) was decided on April 15, 1980, during the pendency of this case. *United States v Johnson* (457 US 537) has since been decided, holding *Payton* to apply retroactively to such matters. *Payton* held that, barring exigent circumstances, the Fourth Amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest, even where probable cause exists. There was no warrant here, though there was probable cause, and on examination, it is clear that there were no exigent circumstances. The People cite the factors outlined in *United States v Reed* (572 F2d 412, cert den *sub nom. Goldsmith v United States,* 439 US 913) in support of their contention that exigent circumstances existed in this matter. However, in that very case the government agents had probable cause for a substantial period of time, as the defendants had previously sold heroin to an undercover agent. Nevertheless, the agents proceeded to the defendant's apartment without a warrant and knocked at the door. When Ms. Reed opened it for them, they arrested her and entered. After placing upon the Government a reasonable burden of justifying a warrantless entry and arrest, and after outlining various factors that may be used to

---

* There was no allegation that the officer was looking for shoes for defendant to wear, but rather an admission that he was searching for the weapon.

determine whether exigent circumstances are present (per *United States v Jarvis,* 560 F2d 494, cert den 435 US 934), the court held (at pp 424-425): "Here, inasmuch as the DEA Agents had no contact whatsoever with Reed or Goldsmith for two and one-half months prior to their arrest, and since there is no suggestion of a change in the status of the investigation during that period, we cannot conclude that exigent circumstances were present. Accordingly, Reed's arrest was unlawful."

The time differential between Reed and the instant case cannot be critical. The officers had seven days to obtain a warrant. They exhibited no urgency which, after all, is the definition of "exigency". If, therefore, the police arrested Levan in a place where he had an "expectation of privacy", their action was improper and the search, not being incidental to a lawful arrest, must fall.

The People rely upon *United States v Santana* (427 US 38) claiming "Like the defendant in *Santana,* defendant had no protectible privacy interest which might trigger the need for a search warrant, because he opened the door to his apartment, thereby making himself visible from the public corridor". In *Santana,* an undercover officer arranged a heroin "buy" with one McCafferty, who obtained her drugs from Santana. The officer gave McCafferty marked money and drove her to Santana's house. McCafferty got out of the car, entered the house and returned in a few minutes. She gave the officer the narcotics and told him that "Mom [Santana] ha[d] the money" (*supra,* p 40). She was driven two blocks and then arrested. Several officers immediately drove to Santana's house. As they pulled up in the car, they saw the defendant standing in the doorway of her house, with a brown paper bag in her hand. They pulled up to within 15 feet of her, got out and shouted, "police". She retreated into the vestibule of the house and they followed, catching her in the vestibule. The court held (at p 42) that Santana was in a public place, that "[s]he was not in an area where she had any expectation of privacy. 'What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection' * * * She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely

outside her house". The court then noted that the case involved a true "hot pursuit", because the defendant retreated into her vestibule. "The fact that the pursuit here ended almost as soon as it began did not render it any the less a 'hot pursuit' sufficient to justify the warrantless entry into Santana's house" (*supra,* at p 43 [i.e., crossing the threshold?]).

Levan can be distinguished from *Santana.* He was not standing in the doorway in front of his house, clearly visible from the street to all passersby, automobile traffic, etc., "as exposed to public view, speech, hearing, and touch" etc. He was standing in a place in which he had a legitimate expectation of privacy. Someone rang the doorbell of his home from the common hallway of his multiple dwelling, which is under the control and protection of his landlord for the benefit of the tenants (34 NY Jur, Landlord and Tenant, § 460 *et seq.*). He did not intend to let in the world, when he opened in answer to that bell, but rather opened for a limited purpose. The purpose of the police in going to defendant's apartment was to arrest him for homicide. Had they knocked at the door and had he opened it in response, would the People now maintain that he had exposed himself to public view and given up his expectation of privacy? The police secreted themselves and waited, without announcement, until a third party rang the bell. How long did they intend waiting? Was it for just such an occurrence? When Levan opened the door, he was standing just inside the threshold. Suppose he had been standing two feet within the apartment, but still "exposed to public view"? Suppose someone else had opened the door (a three-year-old child?) and the defendant was standing six feet within the apartment, but still visible from the hallway? Is the distance in feet and inches from the threshold critical? The visibility? Who opens the door? Isn't it the "expectation of privacy" which counts? And the threshold as a physical, legal and philosophical concept?

*Payton v New York* (*supra*) was decided subsequent to *Santana* (*supra*). The facts are somewhat different. The police, without a warrant, used crowbars to break open Payton's door, intending to arrest him for murder. In *Riddick v New York,* decided together with *Payton,* Rid-

dick's three-year-old son answered the door, and the police entered before he had an opportunity to either object or consent. The court, in prohibiting the police from making the warrantless entries in order to make the arrests, used language which could well apply to Levan: "The two intrusions [entries to search and entries to arrest] share this fundamental characteristic: the breach of the entrance to an individual's home. The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home * * * *the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant"* (*supra,* at pp 589-590; emphasis added).

As our Court of Appeals made clear in *People v Belton* (55 NY2d 49, 51, 59-61) it will avail itself of that principle of federalism which permits the court to more strictly construe the State Constitution than the Supreme Court had construed the Federal Constitution, in order to more stringently safeguard individual rights, even where the respective provisions may be identically worded. Should that court not see fit to distinguish the present facts from *Santana* (*supra*), or agree that the Supreme Court, under general constitutional principles such as enunciated in *Payton* (*supra*), would strike this invasion of the home, it may wish to consider these facts under its interpretation of section 12 of article I of the New York State Constitution. Should it do none of these things, then indeed has the castle been breached.

When the police officer arrested the defendant just inside of the threshold, he took him to the living room and placed him against the wall near the closet in which the weapon was found. This was not volitional on the part of Levan. It was not the situs of his arrest, where a search incident to arrest would normally take place, but was a place specifically chosen by the police, within the apartment. Were the arrest made in a "public" hallway, as maintained by the People, then the police should never have entered the apartment, but should have first obtained a warrant. If they entered unlawfully, then any search which followed

was similarly unlawful. If the police were within the apartment lawfully, then the search must be sustained by those principles which govern search incident to arrest. The standards which govern such searches have been set down by the Supreme Court in *Chimel v California* (395 US 752, 762-763) in language which is by now classic:

"When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control' — construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

"There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs — or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The 'adherence to judicial processes' mandated by the Fourth Amendment requires no less."

Unfortunately, out of this seemingly clear language have come confusion and inconsistent holdings with respect to the interpretation of the "grabbable area", i.e., "the area into which an arrestee might reach in order to grab a weapon or evidentiary items". For example, in this very case: we have a defendant arrested in one place, moved to another, four to six feet from an open closet door, near several armed police officers, searched, handcuffed,

facing a wall, with one of the officers placing himself between the defendant and the closet for the purpose of searching the closet, without a warrant. Each side is able to mount a reasonably persuasive argument, based upon conflicting cases, all of which are offered as representing present law, that the closet is or is not within the defendant's "grabbable area" and, thus, is or is not a search incident to a lawful arrest. (For example, cf.: *People v Belton,* 55 NY2d 49; *People v Belton,* 50 NY2d 447; *People v Caldwell,* 53 NY2d 933; *People v Fitzpatrick,* 32 NY2d 499; *People v Floyd,* 26 NY2d 558; *People v Smith,* 89 AD2d 549; *People v Johnson,* 86 AD2d 165; *People v Caratelli,* 83 AD2d 882; *People v Williamson,* 81 AD2d 963; *New York v Belton,* 453 US 454; *United States v Mapp,* 476 F2d 67.)

In *Belton (supra)*, a State trooper stopped a speeding car on the New York Thruway. The officer smelled marihuana from within and observed an envelope of the type usually used to sell it on the floor of the vehicle. He ordered the defendant and the other three passengers out, patted them down, picked up the envelope from the floor and saw that it did contain marihuana. He then placed the four men, who were still standing outside of the car, under arrest. He entered the auto again and looked through the jackets which were inside. Defendant's jacket was lying on the back seat. The officer opened its zippered pocket and found cocaine. Subsequently, Belton's motion to suppress the cocaine was denied, and the denial was affirmed by the Appellate Division (68 AD2d 198). In the first *Belton* case (50 NY2d 447, *supra*), the Court of Appeals reversed, granted the motion to suppress and dismissed the indictment. Citing *Chimel (supra)* it held (p 453) that it was reasonable for an arresting officer to conduct a prompt, warrantless search of the defendant and the area within his immediate control, i.e., " 'the area from within which he might gain possession of a weapon or destructible evidence' ". However, it found that the defendant was effectively neutralized. He was removed from the automobile and was, together with the automobile and the jacket, under the control of the police. He still had a privacy interest in his jacket, which was beyond his "grabbable

area". The search was therefore not incident to the arrest and should have awaited the issuance of a warrant.

The Supreme Court of the United States, however, held (453 US 454, *supra*) that the search *was* incident to a lawful arrest. While it specifically did not consider this case under the "automobile exception", that court found that the interior of an automobile is within the area into which an arrestee might reach in order to grab a weapon or evidentiary item. "The search of the respondent's jacket followed immediately upon that arrest. The jacket was located inside the passenger compartment of the car in which the respondent had been a passenger *just before he was arrested.* The jacket was thus within the area which we have concluded was 'within the arrestee's immediate control' within the meaning of the *Chimel* case" (*New York v Belton, supra,* at p 462; emphasis added).

At the same time the court assured us, "[o]ur holding today does no more than determine the meaning of *Chimel*'s principles in this particular and problematic context. It in no way alters the fundamental principles established in the *Chimel* case regarding the basic scope of searches incident to lawful custodial arrests." (*New York v Belton, supra,* at p 460, n 3.) This seems to mean that while *Chimel* may be changed for automobiles, it is not changed for hallways and apartments and closets.

The case was remanded to the Court of Appeals, which felt that the Supreme Court had extended the holding of *Chimel v California (supra).* While the Court of Appeals referred to *Chimel* with approval, it declined to consider the Supreme Court's rationale as applied to the New York Constitution. Rather, it upheld the search under a different rationale, the "automobile exception".

For myself, as to the instant case, I wish to take *Chimel (supra)* at its face value and to accept the plain meaning of its language. Even assuming no arrest warrant to be required here, under these facts the closet was not an area within the defendant's immediate control, i.e., "the area from within which he might gain possession of a weapon or destructible evidence", and there was no justification for routinely searching the closet without a search warrant.

The defendant was acquitted of murder in the second degree, manslaughter in the first degree and possession of a weapon with intent to use. The jury apparently disbelieved the witness, the decedent's partner in the drug selling business, and credited the defense of justification. The defendant was convicted only of simple possession of the gun. The hearing court had denied the motion to suppress the weapon. Defendant claims this to have been error, as a result of which the gun, the stipulations as to where it was recovered and that the bullet found in the deceased's body came from the same gun, were admitted into evidence. Further, he claims his decision to testify at trial and admit ownership of the weapon was necessitated by the error. As to the remaining evidence, the witness was unreliable and lacked credibility, and the dying declaration was "not sufficiently precise". The People contend that, even were error committed, it was harmless, as defendant had no viable choice but to testify, in order to establish his claim of self-defense.

The error here, dealing with a violation of the Fourth Amendment to the Federal Constitution and section 12 of article I of the State Constitution, is of constitutional dimension. The test for harmless constitutional error is "that there is no reasonable possibility that the error might have contributed to defendant's conviction and that it was thus harmless beyond a reasonable doubt (*Chapman v. California,* 368 U.S. 18; *Fahy* v. *Connecticut,* 375 U.S. 85)." (*People v Crimmins,* 36 NY2d 230, 237.) "The ultimate question, of course, must be whether the People, as the beneficiary of the error, have fully borne the burden of establishing harmlessness by the strict, though not unrealistic *Chapman-Crimmins* standard; fair trial requires no less (*Chapman v California,* 368 US 18, 24, *supra*)." (*People v Schaeffer,* 56 NY2d 448, 456.) There clearly appears a reasonable possibility that the tainted matter: the weapon, the finding of the weapon in defendant's home, and the matching of the bullet with defendant's gun, contributed to his conviction. These items substantially strengthened the People's case. The reliability and persuasiveness of the untainted matter, the testimony of Holman and the dying declaration, especially with the hindsight of the jury ver-

dict, seem questionable. Whether or not defendant would have felt required to testify had the tainted matter been excluded, is problematical. However, the People have failed to sustain their burden, beyond a reasonable doubt.

The motion to suppress should be granted, the conviction reversed and the indictment dismissed.

SULLIVAN, J. P., and BLOOM, J., concur with SILVERMAN, J.; CARRO and FEIN, JJ., dissent in an opinion by CARRO, J.

Judgment, Supreme Court, New York County, rendered on April 23, 1980, affirmed.