THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v ANDRE PADIN SOLER, Respondent.

First Department, March 22, 1983

#### APPEARANCES OF COUNSEL

*Marc Frazier Scholl* of counsel (*David H. Steiner* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for appellant.

*Sol E. Schwartzberg* for respondent.

#### OPINION OF THE COURT

Ross, J.

This appeal brings up for our review the granting of defendant's motions to suppress physical evidence and an incriminating statement.

The New York Drug Enforcement Administration Task Force (Task Force) is composed of Federal agents, New York State Troopers and police officers. This Task Force's primary function is the apprehension of persons who are engaged in the illegal drug traffic.

Late in April, 1981, a confidential informant, who had been working with the Task Force since September, 1980, provided a member of the Task Force with information that the defendant was selling 1,000 $5 bags of cocaine and 100 $10 bags of heroin, everyday, from a storefront social club (club) located at 42 Rivington Street, Manhattan, and that the defendant usually opened the club between 8:30 and 10:00 o'clock in the morning.

In view of the fact that this informant had previously given information which had resulted in the arrest of approximately 25 persons, the Task Force considered him to be very reliable.

Upon receiving this information about large daily sales of narcotics, the Task Force commenced an investigation of the defendant and his club.

At approximately 4:00 P.M. on April 20, 1981, the informant and a Federal undercover officer, named Roberta Rivera (Rivera), entered the defendant's club, where Rivera purchased 20 $5 bags of cocaine for $100 from Jose Lopez (Lopez), who was standing behind a bar, in front of which were three swivel stools. After completing this transaction, Rivera and the informant left the club.

On the day following Rivera's purchase, beginning at 8:30 A.M., a Task Force surveillance team took up positions near the club. This team observed the defendant and Lopez meet in front of the club and talk together; then, while Lopez opened the club and went inside it, the defendant took up a position in a doorway next door to the club; and, thereafter, Lopez kept shuttling in and out of the club while the defendant remained in the doorway.

Later that morning, Sergeant Daniel Brown (Brown) of the New York State Police, who was with the surveillance team's backup unit, approached the defendant, and Lopez, as they stood in front of the club. Brown's purpose was to confirm the identities of the defendant and Lopez. He told

them that he was investigating a break-in and asked them to identify themselves. The defendant produced a driver's license with his name on it. Lopez, without producing any documentation, stated that his name was Jose Lopez and that he lived on the Bowery. As soon as he had obtained the identification information, Brown left.

Shortly thereafter the surveillance team saw Lopez, who was apparently alarmed by the Brown inquiry, close the club and leave the vicinity with the defendant. While the surveillance team lost sight of defendant, they saw Lopez stop and talk to a person, who, unknown to Lopez, was a confidential informant of the Task Force. It is to be noted that this street confidential informant was not the same confidential informant who triggered this investigation.

The next day the street confidential informant called Task Force headquarters to report on the conversation that he had with Lopez the day before. He said that Lopez told him that Lopez and defendant had been lucky because "the defendant was holding 400 nickel bags of cocaine when the [Task Force] team was there, and * * * the defendant had given Lopez 200 extra bags to bring into the club."

On the morning of April 30, 1981, the Task Force conducted another surveillance of the club. They observed a person by the name of Daniel Frisa (Frisa) acting as a kind of greeter. Within a half-hour period, he escorted approximately 10 people in and out of the club and each one of those persons remained in the club about 30 seconds. Also, they observed the defendant arrive at the club and go inside with Frisa.

Shortly after defendant and Frisa went inside the club, undercover officer Rivera appeared and also went into the club. Rivera testified: "[W]hen I walked in I approached the bar and I observed * * * [the defendant] sitting at the bar having coffee, and * * * [Frisa was] behind the bar * * * I asked both Daniel Frisa and * * * [the defendant] if there was anything around and Daniel Frisa asked me what I wanted. I told him that I wanted 20, which was 20 tin foils of cocaine, and I asked him how much. And Daniel Frisa told me $100. At that time I attempted to give * * * [the defendant] $100 and he told me to give the money to Daniel

Frisa * * * At that point I said I forgot something and I left the club. I told him I would be right back." When she returned to the club, Rivera found that the defendant had left. She told Frisa that she wanted to buy 20 tin foils of cocaine and he said that the price was $100. Rivera asked for a discount because the week before she had purchased cocaine from Lopez. Frisa told her that Lopez did not work there anymore but that the next time she came in he would only charge her $4 a tin foil instead of $5. Further, Frisa told her that if he was not there she should speak to the defendant about the discount since Frisa was going to tell the defendant about her.

Concededly, the defendant was the Task Force's main target. As detailed *supra,* in virtually textbook fashion and with a high degree of professional skill, the Task Force methodically gathered evidence against the defendant. This excellent example of "[p]olice surveillance, carried out over several days, corroborated in * * * detail information supplied by a reliable informant" (*People v Betts,* 90 AD2d 641, 642). Not content with surveillance, the Task Force, through undercover officer Rivera, had made two separate "buys" of cocaine inside the club.

During the course of the first full day of surveillance on April 21, 1981, Sergeant Brown questioned the landlord of the storefront, in which the club was located. The landlord told Brown that the defendant had rented the premises for use as a tire shop. The defendant does not dispute that he rented these premises.

On May 5, 1981, Sergeant Brown submitted his affidavit for a search warrant to Justice GEORGE ROBERTS. Brown did not mention defendant's name in his affidavit. Justice ROBERTS issued a "no-knock" warrant, dated May 5, 1981, authorizing a search of the club, as well as of the persons of Lopez and Frisa, for cocaine.

About 8:30 A.M. on the morning of May 11, 1981, members of the Task Force again observed the activities of the club, including the defendant going into the club.

The following morning, May 12, 1981, the Task Force executed the search warrant as soon as they saw defendant enter the club. Brown testified: "I entered the club and

advised, in a loud voice, 'Police, don't move' * * * I observed the defendant * * * standing, at a small wooden bar which is in the rear of the front room of the club. When I said, 'Police, don't move' * * * [defendant] turned around and faced the right hand wall."

When Brown entered the club, he was accompanied by several other members of the Task Force, including New York City Police Officer Gerrard Dunn (Dunn) and Special Agent Andrew Pucher (Pucher) of the United States Drug Enforcement Administration. All of these officers, who were executing the search warrant, were armed with handguns. Both Brown and Pucher testified that when they entered the club they carried their guns in their hands.

Dunn testified that when he entered the club he saw the defendant standing at the bar and about three feet away from the defendant, on the bar, there was a roll of toilet paper. Some minutes later, during the search Dunn saw this same roll of toilet paper on the floor near the left side of the wall. Brown further testified that they recovered 28 small aluminum foils containing cocaine from the cardboard tube within the roll of paper.

Pucher, who was wearing a bulletproof vest and, who as was mentioned *supra,* was carrying a handgun, approached the defendant and told him to turn around and put his hands on the bar. Although defendant denied having any weapons, Pucher patted him down and found a large folding knife in defendant's rear right hand pocket, which Pucher removed. Pucher testified: "I asked [the defendant] if he had any other weapons. He shook his head no. I continued to pat down his outer garments. When I came to his right front pants pocket, I found a bulge and, next to the bulge, a hard object, perhaps two inches long, in his pants pocket * * * I believed that it possibly could have been another type of weapon * * * I asked the defendant what he had in his pocket and he said cocaine * * * I was interested in knowing if he had another weapon in there because I had already found one on his person."

After the defendant told Pucher that he had cocaine in his pocket, Pucher further testified: "I could see the end of a plastic bag just sticking up at the top of his pocket. I put

my hand in his pocket and removed the plastic bag. And I held it to the defendant and I said, 'What is this?' And he said, 'Cocaine.' And I said, 'Are you sure, it's cocaine[1] and not heroin?' And he said that it was cocaine." After the pat down, the defendant was arrested.

Subsequent to the recovery of the cocaine from defendant's person, he was charged in a one-count indictment with the crime of criminal possession of a controlled substance in the third degree (Penal Law, § 220.16). Thereafter, defendant moved to suppress:

(1) the cocaine found on his person by Pucher; and,

(2) the statement he made about cocaine to Pucher, when Pucher was searching him for weapons.

At the evidentiary hearing the only evidence presented was by the People.

After this hearing, defendant's motions to suppress the cocaine and the statement were granted.

■ ■ We disagree with the hearing court's rulings.

■ Based upon the overwhelming evidence of defendant's connection to the illicit drug traffic, the Task Force had probable cause to arrest defendant, even before they executed the search warrant. For example, as mentioned *supra,* the information about the defendant's drug dealing provided by a reliable informant was independently confirmed by the Task Force's surveillance, undercover buys, another informant, defendant's constant presence in premises that were being used regularly to sell cocaine; and, the defendant was the renter of the premises. It is hornbook law that since there was probable cause to arrest defendant, a search of his person was permissible as incident to that arrest. "The justifications for a search incident to arrest are obvious and derive from the necessity to ensure the safety of the officer and to deprive the arrestee of any potential means of escape or of the ability to destroy evidence of a crime." (*People v Evans,* 43 NY2d 160, 165.) Thus, even if Pucher had not conducted a pat down of defendant before arrest, the cocaine would have been discovered during the search incident to an arrest, based upon probable cause.

---

1. Subsequent laboratory analysis revealed that this plastic bag contained cocaine.

When a valid "no-knock" search warrant is executed in premises being used to sell drugs, the police officers executing that warrant are entitled to protect themselves from harm, in this violence-prone environment, by patting down the renter of the premises, who was present, for weapons.

There is ample evidence in the record to justify the officer's pat down of the defendant. Pucher, a veteran law enforcement officer with a decade of experience, testified, as mentioned *supra,* that he patted down defendant to insure his own safety and that of his fellow officers.[2] "Defendants would minimize drug trafficking by arguing that it is not a crime of violence. Because of their illegal occupation, however, drug traffickers do often commit crimes of violence against law enforcement officers" (*People v Broadie,* 37 NY2d 100, 112). In view of the facts in the instant case, we find that Pucher acted reasonably in conducting the pat down. In *People v Levan* (91 AD2d 384, 386-387), we said: "[T]he reasonableness of the action of police officers in prudently discharging their dangerous duty, with due regard to ensuring their own safety * * * is not to be defeated * * * because a less prudent officer might have felt no need to take these precautions * * * 'We are not to strain an immunity to the point at which human nature rebels against honoring it in conduct' (CARDOZO, J. in *People v Chiagles,* 237 NY 193, 197)."

The defendant contends that the absence of the defendant's name on the search warrant provides support for the granting of the suppression motion. Based upon the evidence in this case, which conclusively demonstrates defendant's close association with the cocaine transactions going on in the premises named in the warrant, and with the two persons named in the warrant, Lopez and Frisa, who were

2. The defendant-respondent at pages 15-18 of his memorandum contends that narcotics dealing is a nonviolent crime and scoffs at Pucher's testimony that he was concerned that defendant might be armed. This position of defendant is contradicted by a report issued on February 17, 1983 by the crime analysis section of the New York City Police Department, which analyzed the 1,832 New York City homicides committed in 1981 — the very year of the instant incident. Examination of that report reveals that over one in every five of these homicides were drug related. The entire narcotics business is replete with violence, and no one knows this better than an experienced Task Force officer.

selling this cocaine, we reject the contention that the absence of defendant's name from the search warrant has any significance.

The defendant was not an innocent bystander who happened to be present when the warrant was executed. As a renter of the premises, the defendant was properly detained, while the search warrant was executed. The United States Supreme Court ruled in *Michigan v Summers* (452 US 692, 705): "Thus, for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."

The Task Force investigation showed that the defendant was continually in and about the premises while the cocaine sales were being made by Lopez and Frisa. It is worthwhile to recall that Rivera testified that she discussed a purchase of cocaine with Frisa in the presence of defendant and that Frisa told her that on future cocaine buys she would get a discount from either Frisa or the defendant. "[T]he Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract." (*United States v Ventresca,* 380 US 102, 108.)

■ The trial court further erred when it granted defendant's motion to suppress his first statement about cocaine that he made during Pucher's pat down. Under the facts of this case, that statement was not the product of custodial interrogation, which would have required *Miranda* warnings; but, rather was voluntarily uttered by defendant in response to a legitimate inquiry by Pucher concerning the presence of weapons. The record shows that Pucher did not know what the bulge in defendant's right front pants pocket was until defendant identified it as cocaine. In fact, Pucher testified that having found the knife in defendant's pocket, he continued his search of defendant because "I was interested in knowing if he had another weapon in there".

In our view, under these circumstances, we now conclude that "the actions of * * * [Pucher] in the instant case were reasonable * * * [T]he * * * question posed by [Pucher] * * * was certainly justified in order to protect * * * [Pucher's

and his fellow officers'] welfare." (*People v Chestnut,* 51 NY2d 14, 22-23.)

Accordingly, the order, Supreme Court (SHORTER, J.), New York County, entered May 11, 1982, granting defendant's motions to suppress the cocaine found on defendant's person and his incriminating statement, is unanimously reversed, on the law and the facts, and the suppression motions are denied.

SANDLER, J. P., MILONAS, KASSAL and ALEXANDER, JJ., concur.

Order, Supreme Court, New York County, entered on May 11, 1982, unanimously reversed, on the law and the facts, and the suppression motions denied.