## (June 12, 1984)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v THOMAS KING, Appellant. — Judgment, Supreme Court, Bronx County (Chananau, J.), rendered February 3, 1982, convicting the defendant, upon his plea of guilty, of criminal possession of a weapon in the third degree and sentencing him, as a second felony offender, to an indeterminate term of imprisonment of 2 to 4 years, affirmed. ¶ The operative facts are concisely stated in the dissenting memorandum. At the suppression hearing, Officer Vega testified that the defendant was one of the "players or backers" in the dice game. There was no testimony at the hearing that the defendant was "advancing" or "profiting" from gambling activity (Penal Law, § 225.00, subds 4, 5). Therefore, Officer Vega could not have reasonably suspected that the defendant was promoting gambling in the second degree (Penal Law, § 225.05). Similarly, the officer did not testify that he saw the defendant in possession of the dice. Hence, the officer could not have reasonably suspected that the defendant was in possession of a gambling device (Penal Law, § 225.00, subd 7; § 225.30). Since the officer could not have reasonably suspected that the defendant committed those misdemeanors in the gambling area, he did not have the right to frisk the defendant under CPL 140.50 (subd 3) or to issue him an appearance ticket (CPL 150.20, subd 1) for those misdemeanors. ¶ Despite the arresting officer's error in stating the predicate for his frisk, we may examine the minutes to determine whether there was otherwise a lawful basis for his action. The officer's testimony indicated that the defendant committed a violation by loitering or remaining in a public place for the purpose of gambling with dice (Penal Law, § 240.35, subd 2). His testimony also indicated that the defendant and the other participants in the dice game had committed the additional violation of disorderly conduct by failing to comply with a lawful order of the police to disperse (Penal Law, § 240.20, subd 6). It may be reasonably inferred from the testimony that the "crowd" in the dice game was also obstructing pedestrian traffic (Penal Law, § 240.20, subd 5). ¶ It is also clear from the testimony of Officer Vega that the defendant did not voluntarily leave the supermarket. The defendant only exited the supermarket after the officer had pried open the door and had physically placed him against a wall. At that point, it is not clear whether the officer intended to (i) arrest the defendant or (ii) issue him an appearance ticket. In either event, the frisk was lawful. ¶ The officer had reasonable cause to believe that the defendant had committed the violation of loitering and disorderly conduct in his presence. Hence, he had the right to arrest the defendant for those offenses (CPL 140.10, subd 1). If the officer intended to arrest the defendant, the frisk would have been proper pursuant to that arrest (*People v Soler,* 92 AD2d 280, 285). ¶ As was discussed above, the officer had the right to issue an appearance ticket to the defendant for the violations of disorderly conduct and loitering. If the officer intended to issue an appearance ticket in lieu of a lawful arrest, he had the concomitant right to "pat down" the defendant (*People v Hazelwood,* 104 Misc 2d 1121). ¶ Brief comment must also be made upon the controlling effect of CPL 140.50 (subd 3) upon the facts in this case. There is authority that an individual may not be frisked under that statute for the suspected commission of disorderly conduct or another violation (*People v St. Clair,* 80 AD2d 691, affd 54 NY2d 900). However, the defendant in *St. Clair* was cooperative with the police and he did not flee from the scene. The decision in *St. Clair* did not address the issue of whether a frisk would have been justified if the defendant therein had been uncooperative and had fled from the scene. ¶ The more narrow question thus presented is whether an officer has inherent or common-law authority to

conduct a search for safety purposes in circumstances that reveal only the commission of a violation. We answer this question in the affirmative. An officer must always be accorded the right to take such protective and precautionary measures as a situation might dictate (cf. *People v Rivera*, 14 NY2d 441). ¶ In this proceeding, the defendant's flight from the scene and his unresponsive behavior in the supermarket were highly incriminating acts. It strongly suggested to the officer that the defendant was attempting to hide for an offense more serious than promoting gambling, loitering or disorderly conduct. In that setting, it would not have been unreasonable for the arresting officer to have believed that (i) the defendant might be carrying a concealed weapon or (ii) he might immediately resist the officer's efforts to arrest him or to issue a summons to him. Under these circumstances, the suppression court was justified in crediting the arresting officer's testimony that he frisked the defendant for his own safety. ¶ The motion to suppress was properly denied. Concur — Murphy, P. J., Sullivan and Ross, JJ.

Carro, J., dissents in a memorandum as follows: The court departs from what I believe is the prevailing law and sets a new precedent in today holding reasonable the warrantless search of a man merely on the basis of an officer's desire to give defendant a summons for street gambling and harass him a bit in the process. ¶ Defendant was among a group of 10 men playing dice on the sidewalk. Officers in a patrol car espied this scene and told the men to disperse. When, upon circling the block, they saw the game still in progress, one of the officers got out of the patrol car, intending to issue summonses. As the players scattered, the officer approached defendant, one of the "players or backers", but King went into a supermarket nearby and stood inside the exit door. The policeman ordered him to come out; defendant just stood there. When the officer began to pry open the door, King then came out voluntarily. ¶ At this point the officer should have issued the summons and asked whatever questions he felt were pertinent. Defendant had made no furtive gestures or done anything suspicious, nor had the officer unholstered his service revolver. In sum, the officer had no articulable basis for what he actually did do — put defendant up against a wall and frisk him. ¶ At the suppression hearing, the policeman testified that he had "patted him down for my safety." This is a valid reason under CPL 145.50 (subd 3) for conducting a frisk. Yet, as already noted, there was nothing in King's actions or demeanor to even arouse the officer's suspicion, much less, make him fear for his safety. (Cf. *People v Benjamin*, 51 NY2d 267.) Neither officer had received an anonymous tip which he was then able to partially verify, nor was there anything akin to a "crowd of children", i.e., some exigent circumstance providing a basis for the officer's overreaching. (Cf. *People v Taggart*, 20 NY2d 335.) No suspicious bulge was seen (*People v De Bour*, 40 NY2d 210, 213), no questions had yet been asked (*People v Carrasquillo*, 54 NY2d 248), and thus, as the majority concedes, CPL 140.50 (subd 3) does not authorize this frisk. ¶ CPL 140.50 (subd 1) clearly states that "a police officer may stop a person in a public place * * * when he reasonably suspects that such person is committing, has committed or is about to commit either (a) a felony or (b) a misdemeanor defined in the penal law, and may demand of him his name, address and an explanation of his conduct." First of all, there was no felony or misdemeanor being committed here. What we had, at best, was a violation, hence the frisk would not be available under CPL 140.40. Even if it were, there was no inquiry made of the defendant, nor was it shown that there were exigent circumstances present to disregard an inquiry and engage in a frisk. (*People v Taggart*, 20 NY2d 335, *supra*.) ¶ I am perplexed by the majority arrogating the power to search the minutes for some novel predicate for the frisk — it had always been my understanding that the permissible scope of a police detention was directly correlated to the degree of

the officer's objective, articulable beliefs. (Cf. *People v Cantor,* 36 NY2d 106, 110-111, 113.) I find it both inappropriate and of questionable logic to speculate as to defendant's culpability for "loitering", "disorderly conduct" and "obstructing pedestrian traffic". If the officer had so testified I would suspect him of tailoring his testimony to avoid constitutional objections. (See *People v Parmiter,* 55 AD2d 938.) ¶ Finally, I must take exception to the majority statement of the officer's common-law authority, which, of course, survives in addition to his authority under CPL 140.50. (*People v Rosemond,* 26 NY2d 101, 104; *People v Taggart,* 20 NY2d 335, 339, *supra.*) While certainly an officer who has a legitimate reason to fear for his safety may take whatever precautionary steps are reasonable (and CPL 140.50, subd 3 so authorizes), "[T]he common-law power to inquire does not include the right to unlawfully seize * * * Our court has consistently limited this power when it has been exercised solely on the basis of vague suspicion *or as a means of harassment* (see, e.g., *People v Stokes,* 32 NY2d 202; *People v Schanbarger,* 24 NY2d 288; *Sibron v New York,* 352 U. S. 40)." (*People v Cantor,* 36 NY2d, at p 114; emphasis supplied.) It was not furtive or "highly incriminating" for defendant to go the 15 feet from the sidewalk into the supermarket, any more than it was for the other players who dispersed in different directions. What the majority is saying, in effect, is that whenever an officer makes a minor stop, e.g., for smoking in the subway, jaywalking or turning without signaling, all the officer need do is recite the magic words, "I was afraid for my safety", and he may then search to whatever extent he likes. This does not seem to me to be what the law has been up until now, nor what it should be. ¶ In short, the guidelines we have operated under over the past decades, and which have been reaffirmed as recently as three months ago (*People v Russ,* 61 NY2d 693), are well settled for good reason. "While the police should be accorded great latitude in dealing with those situations with which they are confronted it should not be at the expense of our most cherished and fundamental rights. To tolerate an abuse of the power to seize or arrest would be to abandon the law-abiding citizen to the police officer's whim or caprice — and this we must not do. Whenever a street encounter amounts to a seizure it must pass constitutional muster." (*People v Cantor,* 36 NY2d, at p 112 [per Wachtler, J.]; see, also, *People v Taggart,* 20 NY2d 335, 346, *supra* [Fuld, Ch. J., dissenting]): "True, we might all be more secure from the criminal elements in our society but the loss of liberty entailed in sanctioning such a search is too high a price to pay for the small measure of added security it promises." ¶ Thus viewed, I find inexplicable the court's endorsement of this frisk as a prelude to enforcement of a minor sumptuary law.