## The People of the State of New York, Appellant, v Charles Farrell, Respondent.

First Department, December 28, 1982

### APPEARANCES OF COUNSEL

*Charles E. Knapp* of counsel (*Norman Barclay* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for appellant.

*Edith Blumberg* for respondent.

### OPINION OF THE COURT

Milonas, J.

On January 30, 1981, at approximately 7:15 P.M., Detective Raymond Melendez and Sergeant Joseph Lacy, both in plain clothes, were driving south on Broadway in an unmarked car. As the vehicle neared 72nd Street, Detective Melendez noticed two males with long, unbuttoned coats in front of a Florsheim Shoe Store, which was still open for business. One of the men, the defendant herein, was standing just south of the display window, gazing inside. The other man, Wayne Marshall, was stationed north of the defendant, in the middle of the sidewalk, looking up and down the block. Detective Melendez turned left onto Amsterdam Avenue, at which point Sergeant Lacy observed a white station wagon parked near the northwest corner of

72nd Street and Broadway. The engine was still running, and there was a man in the driver's seat. Their suspicions aroused, the officers determined to investigate further.

Detective Melendez stopped his car on Amsterdam Avenue between 72nd and 73rd Streets, about 100 feet directly across from the shoe store. The defendant was seen motioning to Marshall, who thereupon moved closer to the curb and continued to glance up and down the street. The defendant approached Marshall for an apparent conversation, then turned in the direction of the station wagon. He gestured to it and seemed to speak to the driver before coming back to the shoe store. Shortly thereafter, the defendant began to walk in the direction of the police officers. At this point, he purportedly placed a finger in his waistband, made a tugging movement, and looked north on Broadway. Both he and Marshall then headed south toward the station wagon. Reaching the vehicle, the defendant tapped on the roof and got into the front passenger seat. Marshall continued to walk down Broadway but, prior to turning right on 72nd Street, he was perceived as motioning with his left hand. The station wagon and Marshall soon disappeared from view.

The officers decided to follow the trio. After two quick left turns had put Detective Melendez and Sergeant Lacy back on Broadway, they encountered an unmarked police car some 150 to 200 feet north of the shoe store. Pulling up, they informed the officer inside that they had a possible stick-up team under surveillance and requested that she and her partner, who was purchasing cigarettes, provide assistance. Detective Melendez proceeded right onto 72nd Street. The white station wagon, now containing three men, had stopped at a red light. As Detective Melendez tailed the station wagon north on West End Avenue, Sergeant Lacy radioed for help from other cars in the area. At 102nd Street and West End Avenue, the officers were advised that two unmarked police cars were behind their own automobile. The station wagon halted at 104th Street for a red light. Sergeant Lacy ordered one of the police vehicles to block the path of the station wagon. Once this was accomplished, the policemen exited their cars and converged upon the defendant and his companions. Ser-

geant Lacy drew near the defendant, who had emerged from the station wagon and was by the right rear passenger door. According to Sergeant Lacy, he saw the handle of a gun protruding from the defendant's belt buckle. He seized the weapon, a .38 caliber pistol loaded with five live "dum-dum" rounds and arrested the defendant.

Following a hearing in connection with this matter, the court, in granting the motion to suppress, found the police testimony to have been credible. According to the court, at the time that the officers observed the suspicious conduct of the defendant and his two colleagues at the Florsheim Shoe Store, they would have been justified in making an inquiry since it was reasonable to believe that a crime was about to be committed. However, prior to any attempt by the police to question or arrest the men, there was a renunciation of the imminent criminal conduct, and no crime was actually perpetrated. The court further determined that the police were not positioned sufficiently close to the scene to discern the bulge or outline of a gun. The fact that the defendant's coat was unbuttoned was, in the opinion of the court, at most equivocal or innocuous, and the coat of one of his companions was also unbuttoned without any weapon subsequently being discovered on the latter. Also equivocal were the defendant's going into the store and the presence in the vicinity of the white station wagon. Thus, the court held that in the absence of a showing that a crime has been or is being committed, the mere flight of a suspect does not justify his arrest by the police.

In the instant situation, the actions of the defendant and his companions could have reasonably led the police to conclude that the three men might be "casing" the area in contemplation of a robbery. The officers would, under these circumstances, have been authorized to make further inquiry by questioning the defendant and his colleagues. (*People v Howard*, 50 NY2d 583; see, also, *People v De Bour*, 40 NY2d 210.) In view of the fact that the police had no information that a crime had actually occurred or was about to take place, as well as the lack of any indication that the defendant or his associates were armed (wearing an unbuttoned coat and tugging at a waistband can

scarcely be regarded as signalling the presence of a concealed weapon), "there was nothing that made permissible any greater level of intrusion." (*People v Howard,* 50 NY2d, at p 590.) Whether or not the credible evidence established a renunciation of intended criminal conduct is irrelevant, since it is evident that the actions of the officers were founded upon nothing more than a mere hunch or suspicion that criminal activity was being planned. Reasonable suspicion that a violation of law has been or is about to be committed "must be more than subjective; it should have at least some demonstrable roots. Mere 'hunch' or 'gut reaction' will not do." (*People v Sobotker,* 43 NY2d 559, at p 564.)

Although it is not at all clear that the departure from the scene of the three men constituted flight, as the Court of Appeals declared in *People v Howard* (50 NY2d, at p 592): "Defendant's flight, had there also been indicia of criminal activity, would have been an important factor in determining probable cause * * * but where, as here, there is nothing to establish that a crime has been or is being committed, flight, like refusal to answer, is an insufficient basis for seizure or for the limited detention that is involved in pursuit". The court, therefore, correctly decided that the police, by tailing the white station wagon in which the defendant was a passenger, then cutting it off with an unmarked police car and surrounding it with back-up vehicles, followed by the officers emerging with guns drawn, constituted an arrest because the defendant was physically or constructively deprived of his freedom of movement. (*People v Cantor,* 36 NY2d 106.) Certainly, under the circumstances of this case, the extent of the police intrusion was, at the very least, excessive, and the physical evidence was properly suppressed.

Order of the Supreme Court, New York County (GABEL, J.), dated September 18, 1981, which, after a hearing, granted the defendant's motion to suppress a .38 caliber revolver loaded with five rounds of "dum-dum" bullets, should be affirmed.

ASCH, J. (dissenting). On January 30, 1981, at about 7:15 P.M., Detective Raymond Melendez, together with Sergeant Joseph Lacy, was driving south on Broadway in an

unmarked police car. Both officers were in plain clothes. As they approached 72nd Street, Detective Melendez saw two tall males with open coats standing near a Florsheim Shoe Store. It was a cold January evening and as they later testified, long "unbuttoned" coats are an indication of weapons. One, the defendant, was standing just south of the store display window. His body was hidden from the view of the store patrons. He was peeking over his shoulder and looking *into* the store, not at the window display. The officers inferred from the position of the defendant's head that his stance was an attempt to avoid being seen by those within. The other man, one Wayne Marshall was standing in the middle of the sidewalk, north of the defendant, looking up and down the block. Defendant and Marshall were the only persons just standing there and looking around.

When the officers made a left turn in their vehicle into Amsterdam Avenue at 72nd Street, they saw a stopped white station wagon, its engine running, with a male in the driver's seat. The station wagon was parked on the west curb of Amsterdam Avenue between 72nd and 73rd Streets, about 100 feet directly across from the shoe store. The officers watched as the defendant motioned to Marshall. Marshall thereupon moved closer to the curb and continued to reconnoiter the street. The officers observed the defendant a moment later walk up to Marshall and appear to converse with him. The defendant then walked over to the white station wagon, motioned to it and appeared to be speaking to the driver before again returning to his position just south of the shoe store.

Soon after, the defendant, while walking toward the curb in the direction of the two officers, put his thumb inside his waistband and moved his hand from the right to the left side of his waist toward the middle of his belt. It was a tugging movement as though he was adjusting something in his waistband.

The officers were now confronted with what they believed to be, based on their street experience and training, the classic triad of a stick-up team; robber, lookout and driver. As they watched the three men, the officers' suspicions were heightened by the furtive communications be-

tween the three men. Also, most significantly, when put into context with all the earlier observations, the defendant's suspicious hand movement to his waist band, led the officers to believe that the defendant was armed.

The officers did not act precipitously on their initial suspicions. They first observed the pair and then the trio. The sequence of acts which they watched, though perhaps innocent if viewed separately, taken together, gave these officers, experienced in street crime, reasonable suspicion to believe not only that a robbery was about to be committed but that the defendant, at least, was armed. They, thus, at this point, had enough suspicion to justify a stop-and-frisk of the three men. (*Terry v Ohio,* 392 US 1.)

The defendant, after looking north on Broadway in the direction of a recently arrived unmarked police car, suddenly turned and began walking south on Broadway, joined by Marshall. When the defendant reached the station wagon, he got into the front passenger seat. Marshall continued to walk down Broadway and turned right on 72nd Street, after making a motion with his left hand. The station wagon pulled away from the curb and made a right turn on 72nd Street.

The officers, in their vehicle, made two left turns back on Broadway. At that point they saw the unmarked police car parked some 150 to 200 feet north of the shoe store. They pulled up, advised one officer, who was waiting for her partner, that they were following a possible stick-up team and asked for assistance as soon as the policewoman was joined by her partner.

Detective Melendez then followed the white station wagon under surveillance. Sergeant Lacy was on the radio requesting assistance from the other cars, telling them that he and his partner were following an armed stick-up team. At 102nd Street and West End Avenue two unmarked police cars radioed that they were now directly behind the vehicle containing Sergeant Lacy and Detective Melendez. When the station wagon stopped at a red light on 104th Street and West End Avenue, supported now with sufficient backup, Sergeant Lacy ordered the police car directly behind his to drive diagonally in front of the

station wagon and block its path. This being accomplished, the plain-clothes policemen began to get out of all three cars. At the same time the three suspects stepped out of the doors of their vehicle. Sergeant Lacy saw the handle of a gun protruding over the defendant's belt buckle. This gun, a .38 caliber Taurus pistol, loaded with five live dum-dum rounds, was seized by the sergeant, who also arrested the defendant.

The police officers testified that the area in question had been subjected to a number of armed robberies; that the time when they made their observations, shortly before closing time for retail establishments, was a favored hour for the perpetration of such robberies; and that the movements of the three observed individuals fitted a familiar choreography for armed robbers.

Although the court below found the police officers' testimony regarding their observations credible, and that there were sufficient articulable facts to support a reasonable suspicion that criminal activity was afoot, it held that once the suspects left the scene they had renounced any criminal intent regardless of their motive for leaving. Therefore, reasoned the court, whatever reasonable suspicion of potential criminal activity had existed was entirely dissipated and the act of the police in cutting off the station wagon and arresting its occupants was arbitrary and unlawful. This analysis misses the point however. The defendant was not arrested for robbery or attempted robbery. He was arrested for possession of a weapon after he had been lawfully stopped by police officers who had a reasonable suspicion to believe that he was armed and that criminal activity was afoot.

The trial court's finding that there was a renunciation of criminal purpose was misdirected. The officers had a reasonable suspicion not only that a robbery was about to be committed but also, as a corollary stemming from the facts, that the defendant was armed. Renunciation cannot be a defense to the crime of possession of a gun. (Cf. *People v Vasquez,* 85 Misc 2d 851.) Even if there was reason to believe the trio had abandoned any idea of committing a robbery, there was no evidence that the defendant had

abandoned the gun which the officers' observation had led them to reasonably suspect he had at the original location.

The United States Supreme Court has determined that an officer's observations of actions suggesting a possible robbery, without any direct evidence of the actual existence of a gun, made it "reasonable to assume [that the crime] would be likely to involve the use of weapons". (*Terry v Ohio, supra,* at p 28.) Here the suspicious gestures made by defendant to his waistband and the long unbuttoned coats worn by the suspects furnished the police with an "a fortiori" predicate justifying a stop-and-frisk.

The critical issue presented was whether the police officers, experienced veterans of the police department's Street Crime Unit, trained to recognize conduct indicative of criminal activity, reasonably suspected that one or more of the persons in the stopped vehicle had committed, or were committing, a felony or a misdemeanor. (See CPL 140.50, subd 1.) One does not have to be a trained police officer to appreciate that what the policemen described was strongly indicative of criminal behavior and not merely the vagaries of innocent window shoppers. In short, the police reasonably suspected that one or more of the defendants were unlawfully armed and that all three of them had committed the felony of conspiracy in the fourth degree, that is, conspiracy with intent to perform a class B or class C felony.

That a robbery in fact did not occur, although relevant, does not refute the clear implications of that which the officers had observed, as the hearing court recognized. This is especially so in view of the possibility that the hurried departure of the three individuals may well have been precipitated by the arrival on the block, in the view of one or more of them, of an unmarked police car. Indeed, the highly suspicious character of their departure, with one of their number walking to the corner and turning and signalling to the vehicle to follow and pick him up, is strongly confirmatory of the validity of the police inferences.

The People concede that the blocking of the station wagon's progress amounted to a seizure. (*People v Cantor,* 36 NY2d 106, 111-112.) However, this seizure was "not the

product of mere whim, caprice or idle curiosity" (*People v Ingle,* 36 NY2d 413, 420), but rather the product of careful and reasonable police work. It was neither unreasonable nor inappropriate given the circumstances. The approach of Sergeant Lacy with gun drawn was also reasonable and appropriate in this situation. It did not elevate the seizure into an arrest requiring probable cause. (See *People v Foster,* 83 AD2d 282, 286.) Awaiting the arrival of back-up units, the method of intercepting the station wagon, and approaching with gun drawn, were reasonable safety precautions given the fact that the sergeant was confronting three potentially armed members of a stick-up team.

As he approached, Sergeant Lacy tried to stay out of any potential line of fire. The gun was then seen in plain view, creating probable cause necessary for arrest.

As this court has aptly pointed out: "The police officer is not an actor in a Hollywood scenario, where the quick draw of the gun provides exciting entertainment for the viewers. Rather, the police officer is experiencing the dangers of the real world where the Marquis of Queensberry rules do not apply." (*People v Rivera,* 78 AD2d 327, 331.)

We are unable to agree that the police here acted unreasonably. The delay in stopping the vehicle was an exercise of prudent police judgment and in no way inconsistent with the requirements of CPL 140.50. In light of that which they observed and their well-founded interpretation of those events, the experienced officers in question might well have been subject to criticism if they had simply dropped the matter when the vehicle left.

Accordingly, I would reverse the order of the Supreme Court, New York County (GABEL, J.), dated September 18, 1981, which, after hearing, granted defendant's motion to suppress the silverplated .38 caliber revolver loaded with five live rounds of "dum-dum" type bullets and deny defendant's motion.

BLOOM and FEIN, JJ., concur with MILONAS, J.; SANDLER, J. P. and ASCH, J., dissent in an opinion by ASCH, J.

Order, Supreme Court, New York County, entered on September 18, 1981, affirmed.