THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v WILLIAM ROBERTS, Respondent.

First Department, June 21, 1983

### APPEARANCES OF COUNSEL

*Bruce Allen* of counsel (*Robert M. Pitler* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for appellant.

*Robert S. Dean* of counsel (*William E. Hellerstein,* attorney), for respondent.

### OPINION OF THE COURT

KASSAL, J.

The People appeal from an order which granted defendant's motion to suppress following a combined *Huntley-Mapp* hearing, suppressing the gun found on defendant's person and an incriminating statement subsequently made by him while in police custody.

On August 8, 1981, at about 5:00 P.M., on a sunny, summer afternoon, Housing Department Officer Owens was on routine patrol in a marked police car. Upon stopping at a light on 9th Avenue at its intersection with 19th Street, Owens observed three men on the east side of 9th Avenue, between 17th and 18th Streets, looking in three

adjacent store windows — a delicatessen, a pharmacy and a liquor store. Defendant was in front of the delicatessen, which was open at the time. As testified to by the officers, defendant "was looking in the show window where the guy was doing business." As the officers drove past, Owens observed defendant reach under his jacket, "into the pit of his stomach" and then withdraw his hand. According to Owens, "That's all I observed." He observed only one such movement. He did not notice how far the hand went into the jacket, nor could he estimate how far the hand or fingers were from defendant's waistband belt. Concededly, he saw nothing which indicated the presence of a gun, no bulge of any kind.

As the patrol car passed the men, one of them [not the defendant] "looked" in the direction of the officers, following which the three men turned and "came together". After the officer observed the men for approximately 30 seconds, the patrol car circled the block, whereupon defendant and the other two men were next seen on 19th Street, on the east side of 9th Avenue, with the defendant looking in the window of a different delicatessen. Again, Owens observed defendant reach under his jacket, toward his stomach. The officers parked their car at the curb on the west side of 9th Avenue, having decided to stop the men. Without any inquiry, defendant and the two other men were directed "to put their hands up and lean across" the patrol car, whereupon a frisk of defendant disclosed a .22 caliber handgun. Defendant was handcuffed and taken into custody. No *Miranda* warnings (384 US 436) were given at the scene, but were administered subsequently at the station house. During interrogation, in response to an inquiry from the officer as to why he had the gun, defendant replied that he had it to protect himself since he previously had some problems on 42nd Street.

At the close of the hearing, at which Officer Owens was the only witness, the court granted the motion to suppress. While the suppression court found that the circumstances justified the police in stopping to inquire, the facts did not demonstrate any basis to conclude that defendant had a gun. There was no testimony that this was a high crime area or that the officer was at all fearful for his own safety

or in danger of physical harm. Having decided to suppress the weapon, finding the search unlawful, the court likewise suppressed the statement made at the station house as the fruit of the poisonous tree.

We are well aware of the difficulty encountered in evaluating the conduct of law enforcement officers in terms of street encounters with private citizens. The Court of Appeals has taken cognizance of the competing considerations which require that a balance be struck between "the indisputable right of persons to be free from arbitrary interference by law enforcement officers and the nondelegable duty placed squarely on the shoulders of law enforcement officers to make the streets reasonably safe for us all." (*People v Chestnut,* 51 NY2d 14, 19.) In any case, the burden is upon the judiciary to strike the balance and determine upon the facts presented whether the action taken by the officers was reasonably related to the circumstances as perceived by them at the time.

The dissent overlooks, however, that on this record, there was no street encounter. To the extent that there was a confrontation, it was created by the officers, who proceeded in excess of what was reasonably necessary under the circumstances. The type of conduct observed by them is indistinguishable from countless vignettes ordinarily observed in the streets of this city each and every day.

Despite the reliance by the dissent on the suspicious activity which impelled the scrutiny of the officers, the record does not in any way delineate what about defendant aroused the officer's attention. Was there anything peculiar in his appearance or his dress? Was it the fact that defendant was gazing into the window of a delicatessen where a man apparently was working? Was it the fact that one of his companions glanced in the direction of the patrol car as the officers "cruised" by? Nothing in the record evidences particularly suspicious activity but instead, reflects actions not uncommon in the city, of three men merely "hanging-out".

Nor is appellant aided by the observation that, while looking in the window of the delicatessen, defendant reached under his jacket, into the pit of his stomach. The record does not reflect, and counsel were unable to en-

lighten us on oral argument in identifying the specific part of the body which represents "the pit of his stomach". From the record, it appears that the suppression court, in questioning the officer, had him give a demonstration as to what he had observed. Clearly, there was no visible evidence of a gun, no outline or bulge and no suspicious conduct. It is patent that Officer Owens proceeded on no more than a vague hunch, "the product of mere whim, caprice or idle curiosity." (*People v Ingle,* 36 NY2d 413, 420.)

We recently observed in *People v Reyes* (91 AD2d 935, 936), that "[i]n evaluating the propriety and reasonableness of the actions taken by the police, we must take cognizance of the realities of urban life in relation to the dangers to which officers are exposed daily, which often require split-second decisions, with life or death consequences." This standard, however, does not authorize the police to stop and frisk any person seen by them to reach under a jacket and toward his stomach. This is not appropriate police action under our constitutional safeguards. Plainly, the innocuous conduct on the part of the defendant in looking in the window of a delicatessen on a Saturday afternoon cannot serve as a predicate for a stop and frisk. That the hunch by which the officers proceeded proved to be correct, since the search disclosed the presence of a weapon, has no bearing upon the propriety of the stop or the action undertaken by the officers.

In *People v De Bour* (40 NY2d 210, 215) the court discussed the various levels of police intrusion which, in any given case, must be "reasonably related in scope to the circumstances which rendered its initiation permissible." The first level of justifiable police intrusion authorizes a minimal intrusion to approach to request information where there is "some objective credible reason * * * [although] not necessarily indicative of criminality" (*People v La Pene,* 40 NY2d 210, 223). The common-law right to inquire, the second level, "is activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion in that a policeman is entitled to interfere with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure" (*supra,* p

223). Under the third level, the police may forcibly stop and detain for questioning where there is reasonable suspicion that a person has committed, is committing or is about to commit a felony or misdemeanor (CPL 140.50, subd 1). The statutory right includes the right to frisk if the officer reasonably suspects himself to be in danger of physical injury (CPL 140.50, subd 3). Finally, the fourth and final step permits the officer to arrest and take the person into custody when there is probable cause to believe that the person has committed a crime or offense in the officer's presence (CPL 140.10).

Applying this standard, it has been held that the reaching of one's hand into a pocket or keeping it there, standing alone, does not create suspicion that the person has a weapon (*People v Bernard,* reported with *People v Prochilo,* 41 NY2d 759, 762-763). A fortiori, the placing of one's hand under a jacket, "into the pit of his stomach", without more, is not indicative that the person has a concealed weapon. The behavior is as equally consistent with a host of non-criminal activities and cannot, under the circumstances of this case, authorize the frisk conducted by the officers.

Appellant's reliance upon our recent memorandum in *People v Reyes (supra)*, is misplaced. There, plain-clothes officers on an anticrime patrol in an unmarked car, had maintained surveillance for about 20 minutes, observing defendant and a companion outside five to seven buildings, peering into hallways from dark areas of the block. Defendant and his companion, each, separately, were observed twice entering and exiting a building and then re-entering, carrying a discarded piece of furniture. The furtive activity was such as to reasonably arouse suspicion that defendant was casing the area. Accordingly, the officers went to investigate and, upon inquiry, the companion proclaimed, "I have a knife in my belt", while defendant moved backwards and reached with his left hand toward his rear waistband. We found the circumstances there sufficient to justify the response by the officer in seizing defendant and patting him down to ascertain whether he was armed.

The situation here, however, is significantly different since there was no objectively suspicious activity by defendant. The testimony of Officer Owens is insufficient to

reasonably conclude that what the officers had been observing was a defendant casing the storefront areas. Unlike the facts in *Reyes* (91 AD2d 935, *supra*), where the encounter was at night in a high crime area after a series of several suspicious acts, the encounter here was on a summer afternoon after two equivocal acts and there was no testimony that the officer was reasonably apprehensive for his own safety.

We find controlling our recent determination in *People v Farrell* (90 AD2d 396, affd 59 NY2d 686), where we affirmed the ruling of the suppression court on facts far more compelling to sustain the propriety of the stop and frisk than those present in this case. There, at about 7:15 P.M., on a winter night, two plain-clothes officers observed defendant, wearing a long, unbuttoned coat, standing in front of a store, gazing inside. His companion, similarly dressed, was standing in the middle of the sidewalk, looking up and down the block. The officers also observed a white station wagon parked nearby, with the engine running. After defendant had spoken to his companion and to the occupant of the station wagon he put his thumb inside his waistband and made a tugging movement, as if he were adjusting something. As the officers watched the three men, their suspicions became further aroused that they were not only watching preparations for a robbery but that defendant was armed. After he had observed the police, defendant motioned the vehicle to move on; and defendant and his companion entered the wagon, apparently abandoning any plan they might have had. Nevertheless, the police continued to maintain surveillance over what they believed to be an armed stick-up team and radioed for assistance. After stopping the vehicle, one of the officers observed the handle of a gun protruding under defendant's belt buckle. In *Farrell* (*supra,* pp 398, 399), we found that activity sufficient to arouse suspicion that the three men might be casing the area and concluded that the circumstances warranted further inquiry, but would not support a greater level of intrusion since "wearing an unbuttoned coat and tugging at a waistband can scarcely be regarded as signaling the presence of a concealed weapon". Accordingly, we affirmed the suppression, finding excessive the

extent of police intrusion in that case. Our disposition in *Farrell* was not based upon the fact that there was a "single 'tugging' gesture" or the suggestion by the dissent here that the police response was far too intrusive.

Unlike both *Farrell* (*supra*) and *Reyes* (*supra*), we do not perceive this record as sufficient to conclude that defendant and his companion were casing the stores. The assertion by appellant, relied upon by the dissent, that the stores were normally not frequented by window shoppers has no support in the record and is insufficient to sustain the stop and frisk. Considering all of the facts, while the suspicions of the officers might have been aroused so as to justify further investigation and inquiry, they did not so proceed. The absence of any claim that the officers reasonably feared for their own safety or that they were in danger of physical injury, necessary to the statutory standard for a frisk under CPLR 140.50 (subd 3), is dispositive and suffices to sustain the holding suppressing the gun and the subsequent incriminatory statement. Clearly, there were no exigent circumstances here to justify this level of intrusive conduct by the police.

Accordingly, the order, Supreme Court, New York County (BENJAMIN LANDER, J.), entered January 5, 1982, which, after a hearing, granted defendant's motion to suppress, should be affirmed.

SULLIVAN, J. P. (dissenting). The issue is the legality of police conduct in stopping three individuals who had been observed, apparently "casing" stores in contemplation of a robbery, and frisking one of them, the defendant herein, who had been seen reaching into his waistband.

On August 8, 1981, at approximately 5:00 P.M. on a sunny, summer afternoon, Housing Officers Owens and Riley, in uniform and on patrol in a marked police car, espied three men, each standing in front of, and looking into, the window of separate but adjacent stores on the east side of Ninth Avenue between 17th and 18th Streets. Defendant was looking into the displayless window of a delicatessen, while the others were peering into a pharmacy and liquor store.

As the officers drove past the men, defendant moved his hand toward "the pit of his stomach". Defendant's conduct

was characterized as "reaching into the front waistband of his pants." When they saw the officers' car the three men gathered together and then walked away toward 18th Street. Meanwhile, the officers decided to drive around the block. When they returned to Ninth Avenue they saw the same three men looking into the window of another delicatessen, a block away, near 19th Street. Again, they observed defendant reach inside his waistband.

The officers responded to this second incident by pulling their vehicle over to the curb on the west side of Ninth Avenue, halfway between 19th and 20th Streets, from where they could continue their observations. The three men began to walk away from the store after one of them had glanced in the officers' direction. Without drawing their weapons the officers exited from their vehicle, halted the men, who were by now crossing Tenth Avenue, and directed them to place their hands on the patrol car. Defendant's two acquaintances, who were stopped first, were not frisked. Defendant, hands in his pockets and trailing the other two by about 15 feet, was told to come over to the car where Officer Riley patted him down. A loaded handgun was found in the waistband where he had earlier been observed placing his hand. Arrested immediately and taken to the station house defendant, after receiving the *Miranda* warnings and agreeing to speak to Officer Owens, stated, when asked why he had the gun, that he "had some problems on 42nd Street with some Hispanics".

After a combined *Huntley* and *Mapp* hearing the court, despite crediting the police testimony, suppressed the gun, finding that at most the officers were entitled to question defendant, but had no right to frisk him, especially since Officer Owens, the only witness at the hearing, never testified that he was in danger. The statement was suppressed as the fruit of a poisonous tree. We would reverse and deny suppression since we find, in balancing the government's interest in the detection and apprehension of criminals with the potential encroachment upon an individual's right to privacy and personal security (see *People v De Bour,* 40 NY2d 210, 215; *Terry v Ohio,* 392 US 1, 20-21),

that the officers acted reasonably throughout the entire encounter.

"The touchstone of [any] analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" (*Pennsylvania v Mimms*, 434 US 106, 108-109, citing *Terry v Ohio, supra,* p 19.) In determining reasonableness a court is required to consider "whether or not the police action was justified in its inception and * * * whether or not * * * [it] was * * * related in scope to the circumstances which rendered its initiation permissible." (*People v De Bour, supra,* at p 215.)

Reasonableness turns on an assessment of the entire situation confronting the police officer and not any single, isolated incident. "Courts simply must not, in this difficult area of street encounters between private citizens and law enforcement officers, attempt to dissect each individual act by the policemen; rather, the events must be viewed and considered as a whole, remembering that reasonableness is the key principle when undertaking the task of balancing the competing interests presented." (*People v Chestnut*, 51 NY2d 14, 23.) The reasonableness of an officer's actions "must necessarily turn on the facts in each individual case." (*People v Green*, 35 NY2d 193, 195.)

A police officer has a common-law right to inquire, which, "activated by a founded suspicion that criminal activity is afoot" (*People v De Bour, supra,* at p 223), "carries with it the right to interfere with a citizen to the extent necessary, short of a forcible seizure, to obtain an explanation" (*People v Santiago*, 64 AD2d 355, 359). Justification for more invasive police behavior is governed in New York by statute. CPL 140.50 (subd 1) provides that "a police officer may stop a person in a public place * * * when he reasonably suspects that such person is committing, has committed or is about to commit either (a) a felony or (b) a misdemeanor defined in the [P]enal [L]aw, and may [inquire] of him". Under CPL 140.50 (subd 3) an officer may search an individual whom he has so stopped for a weapon if he "reasonably suspects that he is in danger of physical injury". From a constitutional viewpoint, "[t]he officer need not be absolutely certain that the individual is armed;

the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." (*Terry v Ohio, supra,* at p 27.)

Measured by these precepts the police conduct in this case comports with constitutional standards. Although suspicious at the outset by virtue of their observation of three men standing in front of three adjoining stores, each looking into the window of a different store, while one of the group, defendant, was reaching into his waistband, the officers chose not to stop them at that juncture, as they might have done, but instead drove their car around the block for further opportunity to confirm their suspicions. Once again they came upon the same group, this time in front of a different delicatessen. Again defendant was seen thrusting his hand toward his waistband. By now he and his two companions had been observed looking into four different store windows. Significantly, these stores — two delicatessens, a liquor store, and a pharmacy — were hardly the type usually associated with random window shopping. Officer Owens testified that the view into these stores was unobstructed. Furthermore, the officers could properly take into account the trio's reaction to their presence. When the men first spotted the marked police car they gathered together and then moved on. As soon as they noticed the patrol car after it circled the block, they began to walk away from the delicatessen.

After circling the block and finding the same trio gathered in front of yet another store, a different delicatessen, and looking into its window, with defendant again reaching into his waistband, the officers fairly concluded that the men were "casing" the various stores and were justified in detaining them and investigating their actions. Fraught with danger in view of the suspicion that defendant was armed, the situation called for a quick, yet measured, response. And that is precisely what occurred here. The officers' conduct cannot be described as anything less than sound police work. Without drawing their guns, they merely approached the three men, and conducted a limited "pat-down" search of defendant, who at the time was the one suspected of carrying a weapon. "[T]he predicate estab-

lished defines the scope of permissible police conduct." (*People v Stewart,* 41 NY2d 65, 66.) Once the predicate for the stop and inquiry is established — the suspicion that the trio was contemplating a holdup and that defendant was armed, as evidenced by his movements toward his waistband — the foundation was laid for the protective frisk. After all, as the Court of Appeals has noted, "[i]t is quite apparent to an experienced police officer, and indeed it may almost be considered common knowledge, that a handgun is often carried in the waistband." (*People v Benjamin,* 51 NY2d 267, 271.) While ideally the lesser intrusion would have been to inquire first, in these violent times the oft-repeated adage "[t]he answer to the question propounded by the policeman may be a bullet" (*People v Rivera,* 14 NY2d 441, 446) remains a sapient truism. "It would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety." (*People v Benjamin, supra,* at p 271.)

That the testifying officer never stated that he feared for his life does not mean that his conduct exceeded constitutional limitations. His narrative obviated the need for any mechanical incantation of fear (see *People v Fernandez,* 88 AD2d 536; see, also, *People v Samuels,* 50 NY2d 1035; *People v Clee,* 89 AD2d 188, 191), since the potential for harm and the officers' apprehension for their safety was self-evident.

Nor does the recent decision in *People v Farrell* (90 AD2d 396, affd 59 NY2d 686) compel a different result. There, the defendant and his companion were observed "casing" only one store by officers in plain clothes who were in an unmarked car. Thus, the *Farrell* suspects were not necessarily reacting to the presence of police officers when they left the scene, as is the case here. Moreover *Farrell* (*supra*) involved a single "tugging" gesture which occurred long after the officer's attention had been drawn to the defendant. Most importantly, however, the police response here was far less intrusive. In *Farrell* the police followed the defendant's car, blocked and surrounded it with a number of police cars, and then converged upon him with guns drawn. This court found the nature of the intrusion so excessive as to constitute an arrest (*supra,* p 399). In

contrast, the stop here was a routine street encounter without drawn guns — an intrusion which obviously constitutes a lesser invasion of one's freedom of movement.

Since defendant's rights were not violated during the course of the justified and limited intrusion which yielded the loaded gun, defendant's postarrest statement can no longer be considered the "fruit of a poisonous tree". Accordingly, the order suppressing both the gun and the statement should be reversed and suppression denied.

FEIN and MILONAS, JJ., concur with KASSAL, J.; SULLIVAN, J. P., and ROSS, J., dissent in an opinion by SULLIVAN, J. P.

Order, Supreme Court, New York County, entered on January 5, 1982, affirmed.