■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CORNELL MILLER, Appellant.—Judgment of the Supreme Court, New York County (Beatrice Shainswit, J.), rendered May 23, 1984, which convicted defendant, upon his guilty plea, of criminal possession of a weapon in the third degree, is reversed, on the law and the facts, suppression granted and the indictment dismissed.

Defendant was indicted on a single charge of criminal possession of a weapon in the third degree, based upon the seizure of a loaded .38 caliber gun on his person. The sole issue on this appeal is the propriety of that search.

At 9:24 A.M. on August 5, 1983, the police received an anonymous telephone call from a person saying that he was at 219 Edgecombe Avenue. He stated that a short, black, Jamaican man, wearing a tan leisure suit, had taken a gun out of a case and placed it in his waistband; that the man had been standing with two other black men, one of whom was dressed all in gray and was a little taller than the gun carrier; that all three men had run into the basement of 277 Edgecombe Avenue; and that the man carrying the gun looked as if he was going to shoot someone. (A tape of this 911 call was played to the court.)

Five minutes later, at 9:29 A.M., a radio run was transmitted stating that three men had entered the basement apartment at 277 Edgecombe Avenue; that a man with a tan leisure suit had a gun in his waist and a second man in the party was wearing all gray. (A tape of the radio run was also played to the court.) The transmission was received by Officers Patterson and Popp, in separate patrol cars, as well as by other officers.

Officer Patterson, the sole prosecution witness, claimed that due to distortion in transmission, she heard the second man's description as wearing a gray shirt and black pants. Further, she testified that she knew the specified address as a drug-dealing location. Officer Popp, called as defendant's witness, testified that his sole recollection of the description of the second man was that he was wearing a gray shirt. As Patterson's car was nearby, it took no more than a minute to reach the reported location. Three other patrol cars were already at the location, including the one which had brought Officer Popp to the scene.

Patterson joined Popp on the street in front of the building, all other officers having run into the basement of the building. In front of the specified building, she noted defendant wearing

an open gray shirt with a black tank top underneath, and black pants; a man approximately 5 feet, 3 inches tall, in a brown uniform, sweeping the sidewalk, whom she assumed was the building's superintendent; and a third man sitting on the stoop of the building with defendant. No one else was on the street. Initially, Patterson paid little attention to these three men because she believed that they had been checked out by the officers who had arrived earlier; further, they made no attempt to leave the scene.

However, three to four minutes later, Patterson, standing 12 feet away from defendant, observed him remove his hand from inside the front waistband area of his pants, consistent with either tucking in his shirt or, in her experience, the act of a gun carrier pushing the weapon down to make sure it does not slip out. She asked Popp if anyone had checked these men. Popp said no and proceeded to frisk the man sitting on the stoop with defendant. Patterson drew her gun and pointed it at that individual. No weapon was recovered. Patterson then frisked defendant, while Popp drew his gun and pointed it at defendant. She felt a hard object which felt like a gun in defendant's groin area. Officer Popp completed the search and pulled out the loaded .38 from defendant's pants. Defendant was then arrested, taken to the station house and given his *Miranda* warnings. Thereupon, defendant stated he had purchased the gun on the street for $75.

Defendant, 6 feet, 1 inch, testified in his own behalf that he had been in front of the building with his friend, Richard Lucas, 8 to 10 minutes before the police arrived. He was wearing blue jeans, a black tank top, and carried a gray shirt with a white collar over his arm because it was too hot to wear it. There were at least three other individuals on the street when the police arrived. A woman officer asked him and his friend whether they had seen three people run into the basement. After both answered no, defendant was directed to turn around and was patted down, with a male officer completing the search by pulling the gun out of his jockstrap. Defendant denied he had made any effort to conceal the gun prior to the conduct of the pat down. Defendant also testified he was arrested but not given his *Miranda* warnings, and on the way to the station house he told the officers he had not done anything wrong because he had purchased the gun on the street for $75 only to protect his wife, who had problems with burglars.

Criminal Term denied the suppression motion, relying essentially on the combination of the radio run description,

defendant's gray shirt, and defendant's waistband gesture to support the stop and frisk. However, the combination of the information contained in the anonymous tip and defendant's equivocal waistband gesture did not justify the police intrusion. *(People v Benjamin,* 51 NY2d 267, 271; *People v Roberts,* 94 AD2d 237.)

Utilization of information obtained from an anonymous tip must meet a specific standard, a "showing that the information conveyed was so specific and congruous with that which was actually encountered that its reliability reasonably could have been assumed". *(People v Benjamin,* 51 NY2d, at p 270; *People v McLaurin,* 43 NY2d 902, *revg under dissenting opn below* 56 AD2d 80, 84.)* Measured by this standard, the tip was not self-verifying and failed to cast suspicion on defendant. Clearly, defendant was not the described gun wielder of 10 minutes earlier, as he was not "very short" and wore nothing resembling a tan leisure suit. Indeed, no such person was ever found by any officer. Nor was there any basis to believe that defendant was such individual's described "accomplice", to whom the gun might have been passed in the interval between the caller's observation and the officers' arrival. He was taller than the description of that individual, certainly did not match the specific description of wearing "all gray", and was sitting calmly in front of the described building, not only as the first police officers arrived, but for nearly five minutes thereafter. The officers' testimony that they either heard the radio run description of the second man as one wearing a gray shirt and black pants or remembered a description only of a gray shirt appears to have been patently tailored in an effort to nullify constitutional safeguards. *(People v Bezares,* 103 AD2d 717.)

In any event, the officers' actions must be judged against the actual content of the radio run, not on the basis of their claimed mistaken impression of it. *(People v Lypka,* 36 NY2d 210, 214.)* Here, the officers' actions belied their claimed suspicion of defendant being armed. Their fellow officers had all run right past defendant and Officers Patterson and Popp ignored defendant and his companions for three to four minutes. This was hardly the behavior of officers with specific information and a reasonable suspicion that defendant or his companions were the subject of the radio run. *(See, People v Benjamin, supra,* at p 270.)

Thus, the only predicate for the frisk was defendant's subsequent hand movement. It should be noted that even this stated reason may be doubted in light of the fact that the

officers frisked defendant's companion first, *after* the claimed gesture by defendant alone. In any event, this testimony did not include any observation of a bulge in the area of the gesture. Officer Patterson conceded that the defendant could have been doing anything, including tucking in his shirt. Behavior which is susceptible of innocent as well as guilty interpretation cannot constitute probable cause and "innocuous behavior alone will not generate a founded or reasonable suspicion that a crime is at hand [citations omitted]." *(People v De Bour,* 40 NY2d 210, 216; *see also, People v Farrell,* 90 AD2d 396, *affd* 59 NY2d 686; *People v Allen,* 109 AD2d 24, 32.) Concur—Asch, Fein, Kassal and Ellerin, JJ.

Sullivan, J. P., dissents in a memorandum as follows: Since, in my opinion, the officers who approached defendant had reasonable grounds to believe that he was armed, their conduct in stopping and frisking him was justified. Accordingly, I would affirm the judgment.

When the officers arrived at the scene they had been privy to the contents of a radio transmission reporting that three men had been at an abandoned building at 277 Edgecombe Avenue, and that one of them, a short Jamaican man wearing a tan leisure suit, was carrying a gun in his waistband. The man's companions were reported to be black, and one of them was described as slightly taller and dressed all in gray. The three men reportedly ran into the basement, and the gun wielder looked as though he was going to shoot someone.

Officer Patterson testified that because of a distortion in the transmission she thought the second man was described as wearing a gray shirt and black pants. She also testified that she knew from prior experience that the basement of 277 Edgecombe Avenue was a location from which drugs were sold.

While the other officers who had responded were inside the building, Officer Patterson, who remained outside the building with Officer Popp, noticed defendant and another man sitting on the stoop of 277 Edgecombe Avenue. A third man, dressed in a brown uniform, was in front of the building sweeping the sidewalk. Defendant was wearing an opened gray shirt with a black tank top underneath and black pants. The man in the brown uniform was approximately 5 feet, 3 inches tall. No one else was on the street.

Officer Patterson, standing about 12 feet away, observed defendant remove his hand from inside the front waistband area of his pants. Since she knew from prior experience that

this gesture could mean that defendant had a gun, she turned to Officer Popp and asked if he knew whether these men had been "checked". While Officer Patterson trained her gun on him, Officer Popp began to pat down the other man on the stoop. Officer Patterson then patted down the outside of defendant's clothing, noting a hard object which felt like a gun in the groin area. She turned to Officer Popp and said "he has something in his pants." Officer Popp then pushed Officer Patterson aside, opened defendant's pants, and pulled out a loaded .38 caliber pistol.

Defendant, who had previously been convicted of robbery, grand larceny and petit larceny, testified that he was standing or sitting in front of 277 Edgecombe Avenue with his friend Richard Lucas for about 8 to 10 minutes when two patrol cars arrived. There were at least three other persons on the street. All the officers ran into the building. A woman police officer approached defendant and asked him if he had seen three people run into the basement. After he said he had not, the officer asked Lucas the same question. The officer then told defendant to turn around, and she subsequently patted him down and felt the gun which he carried in his jockstrap. After a male police officer completed the search and recovered the gun, defendant was arrested. He was not given his *Miranda* warnings.

The court credited the police officers' testimony, and denied in its entirety defendant's motion to suppress the gun and statements. The court found that the officers had reason to fear for their safety when, in responding to a call reporting a man with a gun at a specified location in a high-crime area known for its drug activity, one of them saw defendant, who partially matched the description of the accomplice of the reportedly armed man, reach into his waist, thereby arousing the officer's suspicions that he was pushing a gun deeper into his pants.

In opposing a motion to suppress, "[T]he People must take the initiative to show that in view of all the circumstances the action taken was justified". *(People v Benjamin,* 51 NY2d 267, 270, citing *People v Lypka,* 36 NY2d 210.) That burden has been met here. The majority, too casually in my view, dismisses defendant's conduct in reaching into his waist as suspicious behavior because it was equivocal. That persons may, on occasion, for a variety of reasons, make similar hand movements does not require the experienced police officer on the scene to disregard potentially dangerous conduct and jeopardize his safety. As innocuous as the motion might seem

to the untrained eye, it is an incontrovertible fact that defendant had a gun secreted in his pants.

Nor can I agree with the majority's characterization of the officers' testimony as to their recollection of the radio report as incredible as a matter of law. Three men were reported at the building, one of whom was described as short, dressed in tan and carrying a gun; another was described as being dressed all in gray. Officer Patterson testified that because of a distortion in the radio transmission she thought one man had been identified as wearing a gray shirt and black pants, which was what defendant was wearing. Officer Popp, called by defendant, testified that she could only recall a description of a man wearing a gray shirt. Aside from the discrepancy in the color of the pants, the testimony was not so outrageous as to warrant a finding that it was categorically false and tailored to meet constitutional exigencies.

In *People v Bezares* (103 AD2d 717), upon which the majority relies, one officer had testified seeing four men and his partner only two. This major discrepancy was used to bolster the finding that the officer had tailored his testimony as to what he heard on the radio report regarding the colors of the shirts the suspects were wearing. Here, three men were reported at the identified address, and three men were observed at the location when the officers arrived. One of them was wearing gray, as was reported on the radio; another was short (5 feet, 3 inches) and wearing a brown (tan?) uniform. All were black, as described. The parallels between what was reported and what the officers saw at the scene are close enough not to disturb the findings of the suppression court, which, with the opportunity that this court does not have of observing the demeanor of the witnesses, credited the officers' testimony.

When an officer responds to a radio run and finds no manifest indicia of criminal activity his investigation must concededly be less intrusive than if he were to observe conduct evincing such activity. At the same time, however, he must be permitted to combine his prior knowledge, i.e., a report he had heard on the radio, with his own assessment and corroboration of the events with which he finds himself involved, and be able to undertake certain reasonable self-protective and investigatory steps. *(People v Chestnut,* 51 NY2d 14, *cert denied* 449 US 1018; *People v McRay,* 51 NY2d 594.)* "[A] radioed tip may have almost no legal significance when it stands alone, but * * * when considered in conjunction with other supportive facts, it may * * * collectively,

although not independently, support a reasonable suspicion justifying intrusive police action." *(People v Benjamin,* 51 NY2d, at p 270.)

Clearly, an officer may conduct a frisk of a person for weapons without having probable cause to arrest when the officer has reason to believe that the person is armed and may be dangerous. (CPL 140.50 [1]; *Terry v Ohio,* 392 US 1, 14; *People v Carney,* 58 NY2d 51.) Here, the radio run description of a man dressed in "all gray" who was in the company of a man with a gun and wearing a tan suit provided the officers with enough information to stop and question those individuals at the scene matching the descriptions. Since defendant, with his gray shirt, partially fit the description of the armed man's companion, the officers' suspicions were reasonably aroused that he might be one of the persons described in the radio run. *(See, e.g., People v Fernandez,* 58 NY2d 791, 793.) At that point the officers were entitled to approach defendant and request information. *(People v De Bour,* 40 NY2d 210, 213.)

While the radio run did not indicate that the man in gray had committed a crime, additional factors independently observed by officers at the scene, including any furtive movements by suspects indicating that weapons may be present, can also give the officers reason to investigate. *(People v Russ,* 61 NY2d 693, 695; *People v Benjamin,* 51 NY2d, at p 271.) Here, Officer Patterson's knowledge that drugs were dealt at the given location could also reasonably have led her to conclude that defendant might be armed with his own gun. *(See, People v Soler,* 92 AD2d 280, 286.) In any event, when she observed him reach into his waistband before any investigation could begin she had reasonable suspicion to believe that he might be in possession of a handgun. Under the circumstances, the officers were justified in conducting the limited, self-protective frisk which followed before making any inquiry. *(See, People v Foster,* 83 AD2d 282, 286-287.)